855 F.2d 125
 Anthony COOPER, Abdur-Rahim Farrakhan, Conrad Corley, Robert
Stevens, Rodney Daniels, William Stovall, Appellants,
v.
Elijah TARD, Jr., individually and in his official capacity;
Willis Morton, individually and in his official capacity;
Michael Voigh, individually and in his official capacity;
F. Zimmer, individually and in his official capacity;
Richard Byrd, individually and in his official capacity;
and, Frank Markward, individually and in his official capacity.
Anthony COOPER, Abdur-Rahim Farrakhan, Conrad Corley, Rodney
Daniels, William Stovall
v.
Elijah TARD, Jr., Superintendent, Alan C. Koenigsfest,
Policy Development Asst., Willis Morton, Chairperson for
(M.C.U.), Gildo Depaolis, Chief Deputy, J. Swal, Guard,
Michael Voigh, Guard, F. Zimmer, Guard, Richard J. Byrd, Guard.
Appeal of Anthony COOPER, Abdur-Rahim Farrakhan, Conrad
Corley, Rodney Daniels, Robert Stevens, and
William Stovall.
Anthony COOPER, # 63924, Conrad Corley, # 63302, Rodney
Daniels, # 64201, Abdur Rahim Farrakhan, # 63624
v.
Elijah TARD, Jr., as an individual and in his official
capacity as the Warden at Trenton State Prison, Arthur
Jones, as an individual and in his official capacity as
Hearing Officer at Trenton State Prison, and Sgt. Frank
Markward, as an individual and in his official capacity as
Supervisor of the Management Control Unit, Robert Balicki,
as an individual and in his official capacity as Hearing
Officer at Trenton State Prison, and Officer Richard J.
Byrd, as an individual and in his official capacity as a
Correction Officer at Trenton State Prison.
Appeal of Anthony COOPER, Abdur-Rahim Farrakhan, Conrad
Corley, Rodney Daniels, Robert Stevens, and William Stovall.
 No. 87-5796.
 United States Court of Appeals,
Third Circuit.
 Argued May 5, 1988.
Decided Aug. 24, 1988.
Rehearing and Rehearing In Banc Denied Oct. 5, 1988.
 
 Stephen M. Latimer (argued), Charles H. Jones, Rutgers Univ. Law School, Prison Law Clinic, Bloomfield, N.J., for appellants.
 W. Cary Edwards, Atty. Gen., James J. Ciancia, Asst. Atty. Gen., Karen A. Wartenburg (argued), Deputy Atty. Gen., Trenton, N.J., for appellees.
 Before HIGGINBOTHAM, STAPLETON and GREENBERG, Circuit Judges.
 OPINION OF THE COURT
 GREENBERG, Circuit Judge.
 
 
 1
 This matter presents First and Fourteenth Amendment challenges to a regulation effective at Trenton State Prison and is before the court on appeal from a final judgment entered in the district court following a nonjury trial. The parties state and we agree that the appeal involves application of the decision of the Supreme Court in O'Lone v. Shabazz, --- U.S. ----, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987), to essentially undisputed facts. Thus, we review the matter independently and may substitute our own judgment for that of the trial court. See D & G Equipment Co. v. First National Bank, 764 F.2d 950, 954 (3d Cir.1985). To the extent, however, that the district judge made findings on disputed issues of fact our standard of review is whether there is sufficient evidence in the record to support those findings. Fed.R.Civ.P. 52(a); Leeper v. United States, 756 F.2d 300, 308 (3d Cir.1985).
 
 I.
 A.
 
 2
 The facts are as follows. In 1981 plaintiffs Anthony Cooper, Abdur-Rahim Farrakhan, Conrad Corley, Rodney Daniels and Robert Stevens, members of the Nation of Islam, were prisoners sent to the Trenton State Prison from other penal institutions.[1] The type of inmate at Trenton State, the only fully maximum custodial institution of the New Jersey Prison System, is demonstrated by the percent serving sentences for murder, rape, assault or robbery in 1981 which was respectively 45, 7, 8 and 24. Plaintiffs were all confined to the management control unit (MCU), a close custody area where prisoners identified as threats to internal security were segregated from the general prison population. The MCU was established following a violent confrontation in 1975 between two rival groups of Muslim prisoners in which one inmate was killed and several were very seriously injured. Inasmuch as the MCU is designed to prevent problems, including violence and disorder, assignment to it is determined on the bases of prior criminal activity, institutional adjustment, psychological reports, staff observations and confidential sources. Thus, the inmates in the MCU represent a significant threat to the safety and orderly operation of the prison. Although inmates are not transferred to the MCU without a hearing, it is not a punitive unit and therefore its purpose differs from that of a disciplinary segregation facility.
 
 
 3
 Through tight control of the MCU, the prison authorities prevent problem inmates from becoming catalysts to violence, disorder and escape. Congregate activities including religious services are extremely limited in the MCU as they are inconsistent with the unit's objectives of containing and neutralizing the conspiratorial interests of inmates assigned there. Some inmates are assigned to the MCU even though their records are relatively good because the authorities view them as sophisticated operators who work through intermediaries and thus pose a significant threat to internal security. Significantly, none of the plaintiffs suggests that his assignments to the Trenton State Prison and the MCU were in any way inappropriate.
 
 
 4
 By any standard the inmates in the MCU are tightly controlled. They are confined to their cells for the entire day, including meal times, except for a one hour and ten minute exercise period in an enclosed yard measuring 20 feet by 80 feet. Inmates in the MCU receive double escort. Only 20 to 25 inmates are present in the yard when it is in use. At the times material to this case there were less than 30 inmates in the MCU.
 
 B.
 
 5
 The Nation of Islam, to which plaintiffs belong, is based on the Koran as interpreted by Elijah Muhammad and ministers within the Nation. While the Nation recognizes the validity of individual prayer, it considers group prayer more significant as it reflects the cooperative nature of the religion. Plaintiff Cooper was recognized as an Imam or spiritual leader by the other plaintiffs. The prison authorities, however, do not recognize him in that capacity in the MCU. The Nation has a hierarchy with ranks such as captain, lieutenant and secretary.
 
 
 6
 In May 1981 plaintiffs were charged in a disciplinary proceeding with violating an administrative regulation barring group demonstrations when they engaged in a group prayer called a "Du'a," during which they stood in a circle for a few minutes. They were acquitted of these charges. Subsequently, the regulation was amended to provide that:
 
 
 7
 Inmates are forbidden in any area of the institution to engage in any unauthorized group activity such as an:
 
 
 8
 a. Educational activity conducted without Education Staff supervision;
 
 
 9
 b. Sports activity conducted without Recreation Department of Custody Staff Supervision;
 
 
 10
 c. Religious activity conducted without Chaplaincy Department supervision.
 
 
 11
 Thus, the amended regulation prohibited group inmate activity conducted without supervision of the prison's authorities.
 
 
 12
 Notwithstanding the adoption of the amendment, plaintiffs continued to engage in the Du'a in the yard without authorization and without requesting the supervision of the Chaplaincy Department. When plaintiffs were engaged in the Du'a other inmates stood around watching and were inactive.
 
 
 13
 Because they violated the amended regulation, disciplinary charges were again filed against plaintiffs and all received sanctions ranging from the loss of privileges to loss of commutation credits. Plaintiffs make no challenge to these disciplinary findings and, insofar as appears from the record, did not appeal them to the New Jersey courts.
 
 
 14
 Plaintiffs subsequently brought three separate actions, later consolidated, in the district court charging that the defendants, the prison authorities, had infringed their rights to exercise their religion freely under the First Amendment and had denied them equal protection of the laws under the Fourteenth Amendment.[2] Plaintiffs then moved for an interlocutory injunction while defendants moved for summary judgment. Both motions were denied. Following a nonjury trial, the trial judge, Judge Bissell, reserved decision pending the decision of the Supreme Court on the appeal from our decision in Shabazz v. O'Lone, 782 F.2d 416 (3d Cir.1986). On June 9, 1987 the Supreme Court reversed our decision. --- U.S. ----, 107 S.Ct. 2400, 96 L.Ed.2d 282. Judge Bissell then filed a comprehensive but unreported opinion ruling in favor of defendants and on October 13, 1987 a judgment was entered dismissing plaintiffs' claims. This appeal followed.
 
 C.
 
 15
 In his opinion Judge Bissell pointed out that the Nation of Islam places high significance upon congregate prayer believing it should be conducted whenever fellow-believers come together. He found that Cooper was recognized as the Imam, or leader, by the other plaintiffs in their prayers and religious activities; nevertheless he concluded that defendants' refusal to allow plaintiffs to engage "in congregate religious activity in the MCU recreation yard is reasonable and permissible" under O'Lone as MCU inmates are dangerous and potentially disruptive persons who tend to invite and provoke inappropriate conduct in others and are capable of undermining the essential authority of prison administrators and correction officers. The judge also found that "repeated rituals by a particular affinity group may well cause factionalism, derision, counter 'demonstrations', complaints, demands for similar status, or physical reactions either in the yard or the cell block." He also noted that plaintiffs had "reasonable opportunities to exercise their religion consistent with the security status" of the MCU as they could pray privately, receive individual visits from an authorized Imam, though he was not from the Nation of Islam, read religious materials, be given substitute food for pork, and observe fasting periods. Overall, he concluded that the regulatory scheme was reasonably related to legitimate penological interests at the MCU.
 
 
 16
 Judge Bissell rejected plaintiffs' argument that the regulation was not uniformly enforced within the yard thus depriving plaintiffs of equal protection of the laws. He found that while basketball games, boxing matches and card games took place in the yard, they were authorized activities conducted in accordance with the challenged regulation as the equipment for these events was either supplied or permitted to be used by the staff and the events were supervised. The judge found there was no evidence that plaintiffs were treated differently from other religious groups.
 
 II.
 A.
 
 17
 Our starting point in the resolution of this case is, of course, O'Lone v. Estate of Shabazz, --- U.S. ----, 107 S.Ct. 2400, 96 L.Ed.2d 282. O'Lone involved a challenge to policies adopted by prison officials which resulted in the plaintiffs, members of the Islamic faith, being unable to attend Jumu'ah, a weekly Muslim congregational service, because their work assignments placed them outside the building in which the services were conducted and prison policies precluded them from returning except for emergencies. The Supreme Court upheld the policies.
 
 
 18
 In O'Lone the Supreme Court pointed out that convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement including those under the First Amendment involving the free exercise of religion. --- U.S. at ----, 107 S.Ct. at 2404. It noted, however, that lawful incarceration brings about the withdrawal or limitation of privileges and rights for various reasons including institutional security. Thus it held, citing Turner v. Safley, --- U.S. ----, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), that prison regulations alleged to infringe constitutional rights are judged under a "reasonableness" test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights. Therefore a prison regulation impinging on inmates' constitutional rights is valid if reasonably related to legitimate penological interests. --- U.S. at ----, 107 S.Ct. at 2404. Accordingly, when such a regulation is challenged, prison officials need not prove that no reasonable method exists by which the inmates' rights can be accommodated without creating bona fide security problems. Ibid.
 
 
 19
 The O'Lone court also made reference to specific factors set forth in Turner v. Safley relevant in a determination of the reasonableness of a challenged regulation. O'Lone, --- U.S. at ----, 107 S.Ct. at 240507. These include whether there is a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it, whether there are alternative means of exercising the right that remain open to prison inmates, what impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally, and whether ready alternatives exist for accommodating the prisoners' right at de minimis costs to valid penological interests. Turner v. Safley, --- U.S. at ----, 107 S.Ct. at 2262. See also Monmouth County Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 331-33 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988).
 
 B.
 
 20
 We have no difficulty sustaining the regulation against the above tests. Cooper was recognized by the other plaintiffs as the Imam or leader, a status Cooper also claimed for himself. Further, the Nation of Islam established a hierarchy with positions assigned to members. Therefore what plaintiffs did was to establish a leadership structure within the prison alternative to that provided by the lawful authorities and contrary to the very purposes of the MCU. Under this alternative authority structure, plaintiffs proposed to engage in daily group activity, and therefore set themselves apart from the other inmates as an affinity group and made the group's existence obvious to other inmates and prison officials. Such a structure posed a potential threat to prison authority that caused reasonable concern among defendants. Therefore, there was a valid, rational connection between the regulation and the legitimate governmental interest put forward to justify it.
 
 
 21
 In reaching this conclusion we do not deal in abstractions and would have to disregard facts established beyond dispute to conclude that the concerns of the prison authorities which led to adoption of the regulation and the proceedings against plaintiffs were not reasonable. While plaintiffs invoke the highest principles of our law, they are dangerous persons who even among inmates convicted of the most serious offenses were singled out for special security treatment. For example, Cooper testified that he was serving a 14 to 15 year sentence for armed robbery and had prior convictions for armed robbery, bank larceny, possession of narcotics and breaking and entering. Although he has been a minister since 1971 he explained that periodically he has been suspended for behavior unbecoming to a Muslim and to a Muslim minister. Unquestionably plaintiffs' confinement to Trenton State Prison and their assignment to the MCU demonstrate that while they are here relying on the law to seek their ends, they have not hesitated to turn against others in violation of the law. Clearly, there is a valid, rational reason for not permitting plaintiffs to establish an infrastructure within the MCU and have it openly function merely because plaintiffs claim a right to engage in their activities on the basis of their religion. See O'Lone v. Estate of Shabazz, --- U.S. ----, 107 S.Ct. at 2406.
 
 
 22
 The inquiry of whether there are alternative means of permitting plaintiffs to exercise their rights is dependent on how the affected right is defined. If exercise of that right means that plaintiffs must be able to carry out their particular unsupervised group activity, then it cannot be accommodated. But if the right is more broadly understood to include, as we think it should, general religious activity, see Monmouth County Corr. Inst. Inmates, 834 F.2d at 338-39, then there are alternative means of permitting plaintiffs to exercise it. Certainly a person is always free to pray individually. Further, plaintiffs may receive visits from an Imam, read religious materials, including the Koran, be given food consistent with their religion and observe religious holidays such as Ramadan. In this regard it must be recognized that while Muslims place great importance on group prayer, individual prayer is acceptable and a Muslim will receive blessings from individual prayer. The validity of individual prayer in prison situations is demonstrated by the uncontradicted testimony of a qualified Imam that a person incarcerated by reason of his own acts is required to follow the restrictions attributable to his status. Here the restrictions included limitations on group prayer. Finally, we note that under the regulation supervised congregate religious activity is an alternative means for MCU inmates to engage in religious expression, albeit one in which the plaintiffs have disavowed any interest.
 
 
 23
 Turner v. Safley also indicated that in considering the reasonableness of a regulation a court should take into account how accommodation of the right will impact on other inmates and guards and on the allocation of prison resources generally. This consideration, of course, has both narrow and broad aspects. The impact may be measured at the immediate time when plaintiffs engaged in the prayer. If so there obviously was some impact as other inmates in the yard became completely inactive during that time. While we do not know whether this was from fear, respect or some other reason, we do know that the other inmates were affected.
 
 
 24
 But more significant than the immediate impact are the broader implications of plaintiffs' activities. As we have indicated, the very purpose of the MCU was to restrict and closely supervise organized inmate activity. Plaintiffs' conduct suggested to other inmates that an organized, unsupervised group could function within the prison.
 
 
 25
 Finally, Turner v. Safley indicated that the absence of ready alternatives to accommodate inmates' rights is evidence of the reasonableness of a prison regulation while the rejection of ready alternatives permitting accommodation at de minimis cost to valid penological interests is evidence that a regulation is unreasonable. Inasmuch as the right claimed by plaintiffs was to function openly as an unsupervised group, there were no alternatives consistent with the concept of the MCU to accommodate it. See Monmouth County Corr. Inst. Inmates, 834 F.2d at 345.
 
 C.
 
 26
 Plaintiffs also make a Fourteenth Amendment equal protection argument. They point out that "other more violent group activity, such as boxing matches and basketball games, which presented a greater security threat, was permitted in the yard." Thus, in plaintiffs' view, defendants' response to plaintiffs' activities was exaggerated. They further indicate that inmates could discuss controversial subjects including religious topics and that other religious groups could engage in activities within the MCU yard.
 
 
 27
 We reject these contentions for several reasons. First, the recreation activities to which plaintiffs point were authorized. Second, there is a fundamental difference between sporting events and informal discussions of controversial topics on the one hand and the existence of an organized, functioning alternative authority structure among inmates on the other. Third, the challenged regulation makes no distinction based on the religious group or sect. Finally, Elijah Tard, who was superintendent at Trenton State Prison during the time of the infractions here, testified that other religious groups did not engage in unsupervised group activities in the MCU yard. Thus, Judge Bissell's finding that plaintiffs were not the victims of discrimination is fully supported.
 
 
 28
 We also point out that this case does not involve any claim by plaintiffs that they unsuccessfully requested Chaplaincy Department supervision for the Du'a. Rather plaintiffs conducted their activities on their own. Thus, we are not faced with a situation in which one religious group could obtain authorization for its services but another could not.
 
 III.
 
 29
 The judgment of October 13, 1987 will be affirmed.
 
 
 30
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge, dissenting.
 
 
 31
 This appeal is about whether the appellants ("inmates") should be denied the right to say the following prayer in an exercise yard:In the name of Allah, the Beneficent, the Merciful, all praises are due to Allah, the Lord of the world, the Beneficent, the Most Merciful Master of this Day of Judgment in which we now live. Thee do we serve and Thee alone do we beseech for Thy help and Thy aid. Help Allah guide us on the right path, the oath of those who now have bestowed God's grace upon us, not the path of those whom our wrath has been brought down on, nor of those who have gone astray after they have heard Thy teachings. Amen.
 
 
 32
 More specifically, it is about whether the district court properly construed and applied the Supreme Court's decision in O'Lone v. Shabazz, --- U.S. ----, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) when it determined that state prison officials' prohibition of the inmates' rights to gather to recite the prayer during regular recreation hours, and the imposition of sanctions against inmates who participated in such prayer, did not violate the inmates' rights to the free exercise of religion under the first amendment. At issue is the difficult question of the proper review that should be given to such regulations in light of O'Lone. As the majority notes, this Court's review of the district court's legal judgment is plenary. To my mind, in light of that standard, affirmance of the district court's judgment states this Court's decision that O'Lone effectively deprives federal courts of review of regulatory measures imposed by prison officials, notwithstanding the effect that those measures have upon the constitutional rights of the inmates. Affirmance requires a reading of O'Lone for the proposition that any proffered justification by a prison administration justifies infringement upon the inmates' constitutional rights. That result is not what the Supreme Court intended by O'Lone, and is flatly inconsistent with the Supreme Court's decision in Turner v. Safley, --- U.S. ----, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987), upon which O'Lone was based, and which establishes a four-part analysis to determine when prison regulations too far infringe upon inmates' rights.
 
 
 33
 Essentially, the position of the officials at Trenton State Prison, Management Control Unit, ("MCU"), is that prohibition of inmates' congregation into groups of five or more is necessary to avoid the development of factions that might pose a security risk in the prison. More particularly, with respect to the religion of the Nation of Islam, (which the inmates were practicing by their involvement in the congregative "Dua" prayer quoted above), the prison officials assert that its hierarchy fosters separatism that is antithetical to prison authority.
 
 
 34
 The district court found that the practice of the Dua prayer was a fundamental aspect of the inmates' sincerely held religious beliefs. Further, it concluded that the prison's regulatory scheme that prohibited congregate prayer in the recreation yard infringed upon the practice of that religion. It determined, however, in light of O'Lone, that the regulations were reasonable because of the justifications that the prison asserted. The district court accepted the prison administration's contentions regarding the potential problems of any congregation of inmates and the assertions regarding the threat posed by the particular religion itself. Although the district court found that no incidents of disruption actually resulted from the prayer rituals, it concluded that such incidents are "an inherent potential which should be forestalled where reasonably possible." Cooper v. Tard, Nos. 81-1959, 81-2199 & 81-2201, slip op. at 12 (D.N.J. Oct. 9, 1987). The district court noted further that "[r]epeated rituals by a particular affinity group may well cause factionalism, derision, counter 'demonstrations', complaints, demands for similar status, or physical reactions either in the yard or the cell block." Id. at 12-13. It found that "the Nation of Islam has a hierarchy characterized by such positions as Captain, Lieutenant and Secretary; [and] therefore, the present inmate-plaintiffs had the potential to establish a regimented 'organizational structure' even more threatening to 'institutional authority' than a less organized affinity group." Id. at 12.
 
 
 35
 The district court based its decision, in part, on the fact that the MCU is the state's highest security facility, and that its inmates were transferees from other state facilities at which they had demonstrated disciplinary problems. The district court appears to have concluded that the test of "reasonableness" of the articulated rationale supporting the imposition of a regulation that infringes upon inmates' constitutional rights is functionally related to the security status of the facility. Cooper v. Tard, Nos. 81-1959, 81-2199 & 81-2201, slip op. at 11-12. Therefore, in the district court's view, since the inmates were confined in a maximum security facility, only a minimal articulation of justification for the regulation is needed to meet the "reasonable" test of O'Lone.
 
 
 36
 In my view, the district court's decision improperly interpreted and applied the Supreme Court's decisions in O'Lone and Turner v. Safley. Those cases do not reflect abdication from the Supreme Court's prior determination that persons convicted of crimes have the right to "reasonable opportunities to exercise the religious freedom guaranteed by the First and Fourteenth Amendments without fear of penalty." Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). Indeed, this Court has previously noted that "[neither Turner nor O'Lone ] alter[ed] ... the well-established rule that infringement upon certain fundamental rights ... may only be justified by a legitimate state interest." Monmouth County Correctional Institutional Inmates, et. al. v. Lanzaro, 834 F.2d 326, 336 (3d Cir.), cert. denied --- U.S. ----, 108 S.Ct. 1731, 100 L.Ed.2d 195 (1988). Proper application of the requisites of Turner do not support the district court's conclusion that the regulation that prohibited their practice of the Dua prayer was reasonable.
 
 
 37
 In Turner, the Supreme Court reminded us that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." 107 S.Ct. at 2259. Turner concerned a prison's regulation that prohibited inmates in neighboring men's and women's facilities from marrying without the prison administration's approval. The asserted rationale for this prohibition was that allowing inmates to choose mates in this manner might result in jealousies that would lead to conflicts between previous correspondents, or that inmates who were released might return to liberate their mates. The Court initiated its review by reaffirming the view that "federal courts must take cognizance of the valid constitutional claims of prison inmates." Turner, 107 S.Ct. at 2259, and noting that the right to marry was constitutionally protected. Id. It noted, however, that some uncertainty had evolved in the wake of Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) (describing the principles upon which evaluation of prisoners' constitutional claims should be predicated), regarding the appropriate standard of review of prison regulations that infringe upon constitutionally protected rights. Therefore, it resolved that uncertainty by stating definitively that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Turner, 107 S.Ct. at 2261 (emphasis added).
 
 
 38
 The Court set out four factors that are relevant to determining whether a regulation is reasonable: (1) "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." Turner, 107 S.Ct. at 2262 (quoting Block v. Rutherford, 468 U.S. 576, 586, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984)). Significantly, the Supreme Court noted on this point that it "found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression." Turner, 107 S.Ct. at 2262 (emphasis added). (2) "A second factor relevant in determining the reasonableness of a prison restriction ... is whether there are alternative means of exercising the right that remain open to prison inmates." Id. (3) "A third consideration is the impact [that] accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id. (4) "Finally, the absence of ready alternatives is evidence of the reasonableness of a prison regulation[, however,] ... the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable...." Id. In light of this test, the Supreme Court determined that the prison's regulation was "unreasonable" because it was not "rationally related" to a prison objective. The Court noted that nothing about the formal imprimatur of marriage would change the possibility that the occurrences that the prison officials asserted as rationale for the regulation would occur.
 
 
 39
 I cannot reconcile these factors with the decision of the district court in this case and, therefore, I cannot conclude that the asserted justifications are reasonably related to legitimate penological interests. First in that regard is the district court's finding that the structure of the Nation of Islam religion was contrary to the authority of the prison and for that fact alone the inhibition of its practice was legitimate. Cooper v. Tard, Nos. 81-1959, 81-2199 & 81-2201, slip op. at 12. (Parenthetically, I must note that I am concerned that any regulation that specifically isolates one religion and discriminates against its practice, runs contrary to the Supreme Court's decision that prison regulations should not favor some religions over others. See Cruz v. Beto, 405 U.S. at 322, 92 S.Ct. at 1081.) The majority's flat assertion, which merely adopts the MCU officials' contentions without any corroborating support taken from the record, that the religion's hierarchy challenges the prison authority is specious. The mere use of titles in the Nation of Islam religion does not demonstrate sufficiently the threat to prison security that the MCU officials contend exists. On this point, the inmates asserted, without contradiction, that the hierarchy of their religion's structure is comparable to other religions. They have stated, for example, that "Minister is similar to a Reverend; that Captain is equivalent to a Deacon or Bishop and that a Secretary is just one who keeps records." Appellants' Brief at 5.
 
 
 40
 If, in fact, it is only the titles themselves that give rise to the prison officials' "legitimate" concerns, then that logic would also dictate that the regulations concerning organized basketball games, which according to the testimony of the superintendent of the MCU, Elijah Tard, were played without staff supervision, be strictly enforced. When viewed with the same myopic deference that the majority apparently views the contentions of the MCU regarding the Nation of Islam, the terminology of that sport appears much more threatening to the security of the prison than the religion. In basketball, there is the "Forward" position, the "Center," the "Point Guard" and, of course, the "Shooting Guard." Obviously this point is intended to be facetious, but I think that it demonstrates the insufficiency of the prison officials' rationale. The officials assert nothing about the tenets or practices of the Nation of Islam religion that would threaten the prison's security. Cf. McCabe v. Arave, 827 F.2d 634, 636 (9th Cir.1987) (prison ban of practice of white supremacist religion that "espouse[d] racial hatred, revenge and violence" was constitutional.) Rather, they assert only that the act of the inmates meeting together in a group of five to pray, and the manner by which they refer to themselves, are threatening. To my mind, these assertions are simply not enough to justify the complete prohibition of the practice of the Dua prayer which is, concededly, fundamental to the practice of the religion of the Nation of Islam. Cf. Allen v. Toombs, 827 F.2d 563 (9th Cir.1987) (prison officials' restriction of maximum security prisoners' participation in Native American religious ritual that required the use of an axe, red hot stones and a pitchfork was validly and rationally related to legitimate security concerns of the prison's administration.).
 
 
 41
 Further evidence that tends to negate the MCU officials' concerns regarding the potential threats of affinity groups is that the inmates--under the observation of the prison officials--performed the Dua prayer on several occasions prior to those occasions in question, without incident and without the officials' expression of any concern. See App. at 41-42 (Cooper's testimony that the inmates had openly engaged in the Dua prayer daily for over a month, in plain view of the prison's officials, without incident and, moreover, that other forms of emotional, religious or political speech in groups were permitted.) This point is supported by the record, particularly by the testimony of Gary Hilton, who had been superintendent of the prison immediately prior to Tard, who conceded that the inmates could gather in a group of four or five in the recreation yard to discuss such topics as politics, the speeches and oratory of Archbishop O'Connor and the teachings of their own religion. See App. at 190.
 
 
 42
 The record demonstrates that there were no alternative methods by which the inmates could have exercised the congregative aspect of their religion which, the district court found and the prison officials conceded, was a fundamental aspect of the inmates' religion. See Cooper v. Tard, Nos. 81-1959, 81-2199, 81-2201, slip op. at 8. Although there were other aspects of the religion that were possible (e.g., individual prayer), the practice of congregative prayer was completely prohibited by the regulation. While the majority is reassured by the fact that it is only "unsupervised" congregative prayer that is expressly precluded, I am not satisfied by that fact.[1] First, I note that the record indicates that by the term "supervise" the MCU officials did not mean simply to oversee the prayer ritual to assure that only the prayer was occurring. Rather, the officials wanted to replace inmate Cooper as the leader of the prayer group, presumably to avoid having other inmates recognize him as a leader. The difficulty with that requirement, however, is that there is no minister of the inmates' faith on staff at the prison and, therefore, there is no one who could "supervise" the religious activity.[2] Moreover, the MCU's assertion that unsupervised prayer meetings presented a significant threat to the security of the prison was belied by Tard's own admission that other unsupervised group activities, that were forbidden by the same regulation that precluded the prayer group meetings, proceeded without any disciplinary action against the inmates who participated in them.[3]
 
 
 43
 Perhaps most compelling, and to my mind the critical distinction between this case and O'Lone, is that the inmates' requests in this case did not impose any additional burden upon the prison. The district court was correct in its reading of O'Lone for the holding that "the prison was not required to accommodate Muslim inmates with such things as special inside or weekend work details ... which could insure their presence inside the prison on Friday afternoons." Cooper v. Tard, Nos. 81-1959, 81-2199 & 81-2201, slip op. at 11 (emphasis added). In this case, however, no such "special" dispensation was needed to accommodate the inmates' religious practice. Although, as the inmates correctly note, O'Lone establishes clearly that the prison administration did not bear the burden to demonstrate that there was not a less restrictive measure that would achieve the penological interest while still accommodating the inmates' religion, there is no contention by the MCU officials that allowing the inmates to practice this aspect of their religion required the alteration of the inmate's out-of-cell schedule, or required the assignment of additional security or that imposed any other administrative or financial burden upon the institution. In light of that fact, I cannot easily accept the majority's view that this case is like O'Lone. In my view, because there is an absence of any additional burden upon the prison in the accommodation of the inmates' religious practices and because the regulation in question leaves no alternative measure of accommodation, the prison officials are not entitled to complete deference in the judicial review of their regulation. More specifically, because accommodation of the inmates' rights to practice the Dua prayer did not result in any impact upon the prison's guards, other inmates, or upon the allocation of the prison's resources, the regulation's "reasonableness" was not demonstrated.[4]
 
 
 44
 I recognize that the inmates are members of a faith that is dissimilar to the Judeo/Christian religion with which most American judges are familiar either by their personal affiliations or by the insights provided in educational experiences that have been dominated generally by the values of European and Western culture. The religious faiths of the world, however, consist of far broader and more divergent religious perspectives than those known intimately to most Americans. For some, the Koran has as much solace and meaning as the Bible or the Torah has for others. The Constitution of the United States does not adopt any religion and neither does it give any religion a less favorable status simply because its conceptions, language and tone are discordant with the religious nomenclature that is familiar to most judges.
 
 
 45
 As I have stated, the dispositive test for this appeal is set forth in Turner, and, upon my application of that test to the contentions raised on this appeal, I am compelled to conclude that the prison officials have failed to demonstrate the reasonableness of its regulation. Although the officials have asserted several penological interests upon which the regulation is predicated, it has not demonstrated that the regulation rationally meets those concerns. Prohibition of the congregative prayer will not mean that inmates will not join factions or treat some inmates with greater deference than others. Although I am admittedly without first hand knowledge, what I know about the realities of prison existence leads me to believe that that result is inevitable. For that reason, I cannot countenance the denial of prayer when other activities, which the prison officials either cannot or simply do not strictly regulate, but that are as likely (if not more so) to encourage the development of factions, occur daily.
 
 
 46
 I am not unaware of the difficulties that exist in the administration of correctional facilities and neither am I unaware of the significant policy concerns that led the Supreme Court to provide great judicial deference to the administrative decisions of prison officials notwithstanding the fact that those decisions impose significantly upon inmates's constitutional rights. I am not inclined, however, to adopt the view that prison walls must shield out the Constitution in order safely to lock in persons who have been convicted of crimes, and, for that reason, I respectfully dissent.
 
 
 
 [1]
 William Stovall was also a plaintiff in the trial court and he is listed as an appellant on the notice of appeal. However, in appellants' brief they state that he "does not join this appeal." It further appears that he was not disciplined by the prison authorities for violation of the regulation challenged in this case and thus even the trial judge indicated that he might not have standing in the case. In the circumstances the appeal will be dismissed as to him and our references to "plaintiffs" shall not include him
 
 
 [2]
 Plaintiffs asserted a right to relief on other bases including the New Jersey constitution. In their brief on this appeal, however, they claim a right to relief only on the bases of the First and Fourteenth Amendments. Thus we consider their other contentions abandoned
 
 
 [1]
 On this point, I also find the inmates' equal protection argument persuasive. The majority's rejection of that challenge on the grounds that "the recreation activities to which the plaintiffs point were authorized," maj. typescript at 15, whereas the congregative prayer was not, is not only a tautological conundrum, but it is inconsistent with the record as well. Tard himself testified that unsupervised basketball or card games that were played in groups of three or more were forbidden by the same regulations that precluded the unsupervised congregative prayer, that such games in fact occurred and that, to Tard's knowledge, no inmate who had participated in those games had ever been disciplined. App. at 84-86. See also infra. note 3
 
 
 [2]
 The prison officials assert that there is a muslim Imam on staff at the prison, but concede that he is of a different faith than the inmates. See App. at 110. I see no reason to assume that it is any more legitimate to require that the inmates have their religious ritual be "supervised" by this minister than it would be to require that Catholics be supervised by an Episcopal priest
 
 
 [3]
 In Tard's examination by Stephen Latimer, counsel for the inmates, the following exchange occurred:
 Q. [The regulation] also prohibits sports activity without Recreation Department or custody staff supervision. Is that correct?
 ....
 A. Yes.
 Q. Do you know whether inmates in the Management Control Unit yard during the time period May, June and July of 1981, when people were allowed out in the yard, engaged in basketball games?
 A. To the best of my knowledge, yes.
 Q. Do you know what administration staff was present in the yard while those basketball games were going on?
 A. There, to the best of my knowledge, would not have been any staff present in the yard during those activities.
 ....
 Q. If the basketball [g]ame had occurred in the MCU yard, that's a violation of your regulation?
 A. If it was unsupervised, yes.
 ....
 Q. Do you know whether anybody other than these plaintiffs received a disciplinary infraction for an unauthorized group activity in the Management Control Unit yard after your regulation of May 22 was issued?
 A. I don't know.
 Q. Do you know whether after that regulation was issued any inmates were charged--any inmates who participated in a basketball game were charged with violating that regulation?
 A. I don't know.
 App. at 84-86
 
 
 [4]
 The final factor established by Turner also persuades me that the regulation was unreasonable. That consideration states that the absence of a ready alternative is evidence of the reasonableness of the regulation. (i.e. if there is no manner by which the religion can be accommodated without presenting risk to the security of the prison, then the complete prohibition is "reasonable.") This factor embodies a different concept of "reasonable," and uses as evidence that the regulation is not overinclusive the fact that no other means of accommodating the religion, without compromising the prison's security, can be articulated. Since I am not persuaded that the practice at question in this case presents a palpable security risk, I am not inclined to view this overinclusive regulation as reasonable. Moreover, since I am not persuaded that prohibiting inmates from leading the prayers will deter deference by some inmates to others, I fail to see why allowing the inmates to continue their ritual as they have been (under the observation of a prison guard) is an unacceptable accommodation of the religious practice. Apart from that, the only way to accommodate the inmates' request, and comply with the prison officials stated policies, would be for the prison to supply a minister of the inmates' faith to lead their prayer rituals, but that solution places an additional burden upon the prison administration which, as O'Lone holds, it is not required to undertake