Johnnie X. STROUD a/k/a
Christopher Brookins

v.

Warden Lawrence V. ROTH, Jr., Assistant Warden Julio M. Algarin, and Assistant Warden Dennis J. Molyneaux.

Civ. A. No. 90–2238.

United States District Court,
E.D. Pennsylvania.

July 12, 1990.

---

**560**

Richard S. Seidel, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for plaintiff.

Ward A. Cotton, Norristown, Pa., for defendants.

## MEMORANDUM

KATZ, District Judge.

The plaintiff is a prisoner who brings two claims for damages under 42 U.S.C. § 1983 against prison officials at the Montgomery County Correctional Facility, where he was incarcerated from March 14, 1989 through March 12, 1990. The plaintiff alleges that he was denied his right to the free exercise of his Islamic faith while being held in administrative segregation, and that his medical treatment and diet for stomach problems were inadequate. The prison officials have moved for summary judgment on both claims. After considering the briefs and supporting affidavits and exhibits of both sides, I conclude that there is no genuine issue of material fact to preclude the entry of summary judgment.

## I. FREE EXERCISE CLAIM

### A. *Facts*

When the plaintiff came to the prison he was classified in the general population. From the first he participated in Islamic activities. On March 17, 1989 he submitted a request to attend Islamic study classes, which was approved by the prison chaplain on March 20, 1990. See Exhibit "D" of Defendants' Motion for Summary Judgment. From March 23, 1989 to July 13, 1989, the plaintiff participated in five of the thirty-two Islamic study sessions. See Defendants' Exhibit "E". He was removed from the class list on July 13, 1989 for non-attendance. See Defendants' Exhibit "F".

The weekly Islamic prayer service known as Jum'a was available to prisoners in the general population without request. The plaintiff attended every week from March 17, 1989 through May 19, 1989, and then attended once more on August 4, 1989. See Defendants' Exhibit "G". The plaintiff also requested and received approval to

participate in the observance of Ramadan. He went to Ramadan services throughout the period of its observance from April 7, 1989 through May 5, 1989. See Defendants' Exhibit "I". Additionally, the plaintiff submitted requests for religious materials, which were approved.[1] See Defendants' Exhibit "J".

The plaintiff was charged with assaulting the inmate Muslim Iman, or leader, in the face with a weapon on August 6, 1989. See Defendants' Exhibit "K". Plaintiff's affidavit does not deny this. See Plaintiff's Exhibit "B". Upon the completion of disciplinary procedures, twenty days in disciplinary segregation were imposed on the plaintiff. See Defendants' Exhibit "K".

On August 9, 1990, the prison chaplain advised prison officials in a written report that "remarks were made in anger by some members of the [Islamic Study] class that Br. John (Inmate Brookins) was looking for a fight with them, and, if they had the chance they would hurt him." *Id.* The chaplain also reported that one particular inmate class member came to him privately and "indicated his fear for himself if inmate Brookins was released, and that he was carrying a sharpened pencil in his pocket and would use it on him of [sic] provoked." *Id.* Plaintiff vaguely says this was a "fragment" of the chaplain's imagination, but offers no opposing affidavits on personal knowledge as required by Federal Rule of Civil Procedure 56(e). See Plaintiff's Exhibit "B". If he attaches such affidavits to a timely motion for reconsideration, I will review them.

Because of these threats of retaliation from within the prison's Muslim community, after his release from disciplinary segregation the plaintiff was reclassified to administrative segregation for his own protection. See Defendants' Exhibit "K". There he remained until transferred to state prison on March 14, 1990. Throughout the period of administrative segregation prison officials perceived a continuing threat to the plaintiff's well-being, as demonstrated by the official reply to his request to be taken out of administrative segregation, dated September 26, 1989: the plaintiff was "still in danger of retaliation" because "the Muslim population [is] seeking revenge for the attack on their Iman." *Id.* The prison officials' reply to another request, dated November 13, 1989, to return to the general prison population, indicates an ongoing threat: "I believe inmate remains at risk of personal safety if returned to general population." *Id.* A reply to another request, dated January 23, 1990, states: "[R]eviewing [the plaintiff's] request for g.p. [general population], his situation has not changed. The inmates he had an altercation with are still a threat to his well-being." *Id.*

While in administrative segregation the plaintiff was not allowed physically to attend religious services with the other inmates. He was permitted to receive religious counseling, obtain religious materials, and view religious services on closed circuit television or videotape as long as these tapes were provided by the prison and not by outside visitors. See Defendants' Exhibit "K", document entitled "Religious Services Available to K POD Inmates." The plaintiff did in fact take advantage of the permitted religious activities. For example, his "wish to send book home, and receive to [sic] books on religion" was approved on November 9, 1989; his request to see a religious video was approved on January 21, 1990; his request to see the "Rev. Nick" about a religious matter was approved on February 13, 1990.

### B. *Law*

█ Convicted prisoners do not give up all constitutional protections, including the right to the free exercise of religion under the first amendment, because of their conviction and imprisonment. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107

---

1. The prison administration's lack of interference with the plaintiff's religion is further evidenced by its response to the plaintiff's request to "establish a classroom to conduct our services...." Defendants' Exhibit "L". The administration "informed inmate of procedures to propose programs," and noted that the plaintiff "will have his Iman call the facility for further info." *Id.*

S.Ct. 2400, 2403, 96 L.Ed.2d 282 (1987). The fact of incarceration, as well as valid penological interests such as institutional security necessitate and justify limitations on many privileges and rights. *Id.* When a prison regulation interferes with an inmate's constitutional rights, "the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349, 107 S.Ct. at 2404; *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987). To meet this standard, prison officials must show that four factors are met.

First, a logical connection must exist between the regulation and the legitimate governmental interest invoked to justify it. *O'Lone*, 482 U.S. at 350, 107 S.Ct. at 2405. The policy here of allowing the plaintiff, during incarceration in administrative segregation, to view closed circuit or videotaped religious services, receive personal visits from the chaplain, and receive religious literature, but restricting him from attending religious services with the general population, meets this test. Plaintiff was put into administrative segregation for his own safety. Prison officials have a legitimate interest in maintaining individual prisoners' safety as well as in preserving general institutional security. By prohibiting a prisoner who is the target of threats of violence by other inmates to mix with the general prison population, prison officials can avert both the threatened violence and any "domino effect" which may spread among the worshipers who are angry about the assault on the Iman. Moreover, the prison's objective is "legitimate and neutral;" all inmates, regardless of religious affiliation, in administrative segregation are prohibited from physically attending religious services. Affidavit of Dennis J. Molyneaux, Assistant Warden–Administration of the Montgomery County Correctional Facility; *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262.

Alternative means of exercising the right to freedom of religious practice also must be afforded to prisoners. *O'Lone*, 482 U.S. at 351, 107 S.Ct. at 2405. In *O'Lone* certain Muslim inmates sued under § 1983 contending that prison policies, which required inmates in their security classifications to work outside the buildings in which Jum'a was held and prohibited them from returning to the buildings during the day, violated their right to practice their religion. The Supreme Court recognized that there were no alternative means of attending Jum'a since the inmates' religious beliefs insisted that the service take place at a particular time. However, the Court noted that "the very stringent requirements as to the time at which Jumu'ah may be held may make it extraordinarily difficult for prison officials to assure that every Muslim prisoner is able to attend that service.... We are unwilling to hold that prison officials are required to sacrifice legitimate penological objectives to that end." *Id.* at 351–2, 107 S.Ct. at 2406.

Instead, there has been no violation of an inmate's free exercise rights as long as he retains the ability "to participate in other religious observances of [his] faith." *Id.* at 352, 107 S.Ct. at 2406. Where an inmate is "not deprived of all forms of religious exercise, but instead freely observe[s] a number of [his] religious obligations," the prison regulation is reasonable. *Id.* Similarly, the Third Circuit has stated that in inquiring whether there are alternative means to allow a prisoner to exercise his right, the right should be broadly construed to include "general religious activity." *Cooper v. Tard*, 855 F.2d 125, 129 (3d Cir.1988); *see Thornburgh v. Abbott*, —— U.S. ——, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989) (the right must be viewed "sensibly and expansively").

The plaintiff was able to participate in Jum'a services by watching closed circuit television or videotapes of the prison's own services, and in fact requested such tapes. Of course, watching a televised religious service differs from experiencing a service in person. However, given the legitimate penological objective of maintaining security, such televised services were a reasonable alternative means by which the prisoner could observe his faith. The Third Circuit has said that the Nation of Islam "places great importance" on group prayer, because it reflects the religion's coopera-

tive nature. *Cooper v. Tard*, 855 F.2d at 127, 129 (prison regulation prohibiting unsupervised group activity did not infringe free exercise rights of inmates who were prohibited from gathering to pray without supervision). Limiting a prisoner who is the target of other prisoners' threats, especially threats from those inmates who are members of his religion, to televised group prayer is a reasonable accommodation of his desire for such worship.

Third, the court must examine the impact that accomodation of the prisoner's asserted right would have on other inmates, prison personnel, and the allocation of legitimate resources. *O'Lone*, 482 U.S. at 352, 107 S.Ct. at 2406. Given the threats against the plaintiff, it was reasonable for prison officials to conclude that allowing the plaintiff to attend Islamic services with the general prison population would jeopardize the security of both the other prisoners and prison personnel.

Finally, the absence of ready alternatives to the prison regulation in question is evidence of its reasonableness, and "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2263. Here, there appear to be no safe alternatives involving plaintiff's physical presence at a Jum'a service to the rule restricting plaintiff to televised group worship under the circumstances. Given the continued threats against the plaintiff, segregating him from inmates bent on revenge is hardly an exaggerated response.

Courts must defer to the judgment of prison officials on "difficult and sensitive matters of institutional administration," even when inmates make constitutional claims. *O'Lone*, 482 U.S. at 353, 107 S.Ct. at 2406. For the reasons stated, summary judgment will be entered in favor of the defendant prison officials on the plaintiff's free exercise claim.

## II. MEDICAL CLAIM

### A. *Facts*

The plaintiff alleges that he "received inadequate medical treatment for stomach problems" and that his "meals which are to be a special diet have been served to [him] as ordinary meals." Plaintiff's Complaint. His prayer for relief includes a request for "a stable diet supplied daily not only on occasions." The plaintiff was diagnosed with gastritis on March 21, 1989. Defendants' Exhibit "M". Prison medical personnel prescribed a bland diet, Zantac and Maalox. *Id*. In March, May and June 1989 he was diagnosed with ulcers and was prescribed Zantac, Maalox and multivitamins. It was noted in the Progress Notes for the plaintiff on July 1, 1989 that he was not taking the Zantac that was ordered. *Id*. In November 1989 he was diagnosed as having "GI upset" and given Maalox and Donnatol. *Id*. Maalox and Donnatol were also prescribed for the plaintiff's stomach problems in December 1989 and March 1990. *Id*.

On May 12, 1989 the Kitchen Department was authorized by the prison health service to put the plaintiff on a bland diet. *Id*. He was sent a special tray containing a bland diet beginning with the evening meal on May 12, 1989 until February 23, 1990, when the prison health service notified the Kitchen Department to remove him from the diet. *Id*. He was on the doctor's list for further medical attention to his stomach complaints after that date until his transfer to Graterford on March 14, 1990. *Id*.

In July 1989 the plaintiff submitted a sick call request stating that he could no longer eat meat because it made him sick; he felt he could only eat egg salad, tuna fish, and vegetables. *Id*. He was again referred to the prison doctor, and in August 1989 was prescribed a "vegetarian diet (Muslim) indefinitely," and in November 1989 was prescribed a Muslim vegetarian diet for 30 days. *Id*.

### B. *Law*

 Failure to provide adequate medical treatment states a claim under § 1983 only if the defendants showed "deliberate indifference to a prisoner's serious medical needs." *Estelle v. Gamble*, 429 U.S. 97,

105, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). Such indifference may be manifested by the response of prison medical personnel to a prisoner's needs, or by prison personnel's intentional denial or delay of access to medical care or intentional interference with prescribed treatment; inadvertent failure to provide medical care is not a violation of the eighth amendment. *Id.* at 104–5, 97 S.Ct. at 290–1. The requisite indifference has not been made out here.

Where a prisoner has received medical attention and disputes the adequacy of such care, federal courts will be reluctant to second-guess medical decisions and to raise state tort law claims to the constitutional level. *United States ex rel. Walker v. Fayette County, Pa.*, 599 F.2d 573, 575 n. 2 (3d Cir.1979), citing *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir.1976). Here the record shows that the plaintiff received a doctor's care for his stomach problems nearly every month he spent at the prison. In addition to medication he was provided a bland diet according to doctor's orders, and when his stomach problems did not sufficiently respond he was given vegetarian meals. There is *no* evidence that the plaintiff's digestive troubles and dietary needs were ignored, or his prescribed treatment thwarted, by prison officials; on the contrary, the plaintiff received ongoing medical attention and treatment.

At most, the plaintiff's claim sounds in tort. A prison physician's "negligence in diagnosing or treating a medical condition" does not make out a § 1983 claim. *Whitley v. Albers*, 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986), citing *Estelle v. Gamble*, 429 U.S. at 105–6, 97 S.Ct. at 291–2. No deliberate indifference having been shown in the record, and drawing all reasonable inferences in favor of the plaintiff, summary judgment will be granted to defendants on plaintiff's medical claims.