**Sterling HOBBS, Plaintiff,**

**v.**

**Chaplain Frank C. PENNELL, Defendant.**

**Civ. A. No. 87–285–JLL.**

United States District Court, D. Delaware.

Jan. 11, 1991.

Sterling Hobbs, plaintiff pro se.

Joseph P. Hurley, Jr. and Ann Marie Johnson, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LATCHUM, Senior District Judge.

### BACKGROUND

■ Sterling Hobbs a/k/a Amir Fatir,[1] the only remaining complainant in the present action,[2] is an inmate at the Delaware Correctional Center ("DCC") serving a life sentence. Mr. Hobbs is a member, and one-time Imam,[3] of the Nation of Islam. The plaintiff's complaint alleged a right of action against the defendant Chaplain Frank C. Pennell under 42 U.S.C. § 1983. After liberally construing the plaintiff's *pro se* complaint,[4] the Court issued a pretrial order, dated October 9, 1990, granting the plaintiff's motion for a non-jury trial. (D.I. 67.) The order also outlined the issues for trial. (*Id.*) These issues are whether the defendant Chaplain Pennell violated Mr. Hobbs' constitutional rights under the Free Exercise Clause of the First Amendment, as applied to the states by the Fourteenth Amendment, by allegedly enforcing prison policies that (a) prohibited the Nation of Islam from holding services at DCC without an outside Imam,[5] and (b) prohibited Hobbs and other members of the Nation of Islam from attending Moslem services conducted by other groups within the prison.[6] (D.I. 67.)

---

1. Amir Fatir is Mr. Hobbs' adopted Moslem name. (Trial Transcript, Docket Item ["D.I."] 69 at A–3.) At trial Mr. Hobbs indicated that the use of either name was acceptable to him. (*Id.* at A–7.) Since the plaintiff commenced this suit under the name Sterling Hobbs, the Court will use that name. (Complaint, D.I. 2.)

2. Initially Oyaide Haamid Salaah, Mu'min Abdur Rahim and Edward Kelly El were included as plaintiffs. (D.I. 2.) Oyaide Haamid Salaah withdrew from the litigation on June 26, 1988. (D.I. 42.) Mu'min Abdur Rahim and Edward Kelly El were dismissed with respect to claims 1 and 4(a) (Order of July 2, 1990, D.I. 60) and had summary judgment entered against them on the remaining claims. (Order of February 17, 1988, D.I. 27; D.I. 60.)

3. An Imam is the equivalent of a Moslem minister. As an Imam, Mr. Hobbs was competent to lead Nation of Islam services.

4. The Court must liberally construe a *pro se* plaintiff's complaint. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972); *Becker v. Commissioner,* 751 F.2d 146, 149 (3d Cir.1984).

5. An "outside Imam" is an Imam who is not a member of the prison population.

6. A preliminary issue is whether Chaplain Pennell is an appropriate defendant in this suit. Chaplain Pennell's duties at D.C.C. are set out in the "CHAPLAIN SUPERVISOR D.C.C. Specific Job Description" at section five and include the following:

   1) Arranges and schedules all formal worship services and programs throughout the year.

   *     *     *     *     *     *

   11) Responsible for the administration/management of systems and routines in the religious services.

   (Defendant's Exhibit ["DX"] 23.) It was also established at trial that Chaplain Pennell was the DCC official primarily responsible for locating an outside Imam to preach at DCC. (D.I. 69 at B–58–59.) Though Chaplain Pennell is not alleged to have instituted the allegedly unconstitutional DCC policies, he was responsible for their enforcement and smooth operation. Further, the defendant has failed to assert any affirmative defenses to the claims made by the plaintiff. The Court therefore concludes that

On November 26, 1990 the Court held a non-jury trial at which the plaintiff appeared *pro se*. The Court has carefully considered the sufficiency and weight of the testimony and documentary evidence presented at trial, as well as, the demeanor and relationship of the witnesses who testified. Pursuant to Fed.R.Civ.P. 52(a) this opinion encompasses the Court's findings of fact and conclusions of law.

## FINDINGS OF FACT

The defendant established at trial that the teachings of the Nation of Islam fall outside mainstream Moslem orthodoxy (D.I. 69 at A–51 *et seq.*) and are in many respects, non-religious. Among the Nation of Islam's tenets are the belief that a separate nation must be created for African–Americans, because blacks and whites cannot co-exist (D.I. 69 at A–39–40; DX 2 at 2, 5.) and the belief that black inmates do not belong in prison. (DX 2 at 2.) These teachings are potentially very disruptive in a prison context such as DCC, where inmates of all races are confined in close proximity to one another, and part of the correctional purpose is to make inmates accept responsibility for their acts. It was also established at trial that the organizational structure of the Nation of Islam is hierarchical and para-military in nature. (D.I. 69 at A–22–24, A–46, A–115, A–117.)

Subordinates report to officers and obey orders. Drills are conducted in military fashion and there is an elaborate system of guards and personal bodyguards.[7] In a prison context, where an inmate is permitted to act as Imam, this organizational structure results in a pyramid of power that has the inmate Imam at its apex. One inmate is left with authority over a large number of well trained and obedient followers.

In April of 1983 DCC authorities were approached by inmates who wanted permission to conduct Nation of Islam services. (D.I. 69 at A–122–23; DX 6.) The inmates proposed that their services, like the other Moslem services at DCC, be led by an inmate Imam. Despite serious reservations, Warden Redman granted the prisoners' request. (*Id.* at A–122.) After less than a year, Warden Redman was forced to put a stop to the inmate led services of the Nation of Islam and cancel a service scheduled for March 13, 1984. (*Id.* at A–118.) Subsequently, on April 4, 1984, Warden Redman permitted the resumption of Nation of Islam services, but only if they were conducted by an outside Imam. (*Id.* at A–119.) The new policy was instituted in response to events surrounding a Nation of Islam service held on March 11, 1984. (*Id.* at A–113.)

---

Chaplain Pennell is an appropriate defendant within the language of 42 U.S.C. § 1983. § 1983 reads in pertinent part:
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

7. Testimony of Sterling Hobbs.
> THE WITNESS: ... [W]e have people on post, and it looks like sort of a military thing, we have people out front searching people....
> THE COURT: Do you have a security within the security system?
> THE WITNESS: That is part of the Nation of Islam's regulations, yes, sir.
>       *    *    *    *    *    *
> THE WITNESS: I don't think we have the need for bodyguards and security people and all that sort of thing myself. But people like to do it because it makes them feel like soldiers.

(D.I. 69 at A–22–23.)
Direct Examination of Treatment Superintendent Donald Davis.
> A: ... [M]y understanding at the time was that [the Nation of Islam] was heavily invested in a para-military organization, that there were soldiers—I put that word in quotes; it might have been called something else—but that there was this para-military arm that was very important and very well organized, organized in self-defense, organized to take orders without question from the leader, and that that was an integral part of the structure.

(D.I. 69 at B–7.) (*See also* D.I. 69 at A–22–24, A–15–17.)

At a Nation of Islam service on March 11, 1984, Sterling Hobbs, the inmate Imam at the time (D.I. 69 at A–117–18) decided to give a particularly inspirational sermon. (*Id.* at A–25.) He suggested that his followers take over the prison and make blood run in the aisles. (*Id.* at A–114.) The prison guards present at the service, who had been frisked by the prisoners—contrary to prison policy—were apparently made uneasy by the Imam's exhortations. (*Id.* at A–22, A–114–15, A–117, A–135.) The situation grew tense (*Id.* at A–24) and the Correctional Emergency Response team was called to the prison. (*Id.* at A–114.) Inmates who were not members of the Nation of Islam were also intimidated. (*Id.* at A–24.) Prison authorities feared that the guards present at the service had been, or would be, taken hostage. (*Id.* at A–114–15, A–117.) This fear was shared by the guards at the service. (*Id.*) Prison authorities showed great restraint and waited. (*Id.* at A–115.) Ultimately the Nation of Islam's "religious service" was dispersed without violence. (*Id.* at A–117.) Mr. Hobbs does not deny that the above events occurred (*Id.* at 133), but dismisses them as the product of youthful indiscretion. (*Id.* at A–133.) Warden Redman, on the other hand, who has nearly forty years of experience in the Delaware Corrections System, saw the events of March 11 as a threat to security and a threat to the lives of his staff. (*Id.* at A–114, A–134–36.) At trial, Warden Redman and other DCC officials explained why, in the aftermath of the March 11 incident, they prefer that Nation of Islam services be conducted by an outside Imam.

As noted above, the teachings of the Nation of Islam are in certain respects confrontational and even racist.[8] It is also apparent from the testimony given at trial that members of the Nation of Islam put differing degrees of emphasis on the more radical teachings of the group. (D.I. 69 at A–22–23, A–43, A–120–121.) Certain teachings of the Nation of Islam, if emphasized, can undermine security at a facility such as DCC. Warden Redman instituted a policy requiring the use of outside Imams so that prison officials could find a responsible person who would not inflame the inmates and would emphasize the spiritual rather than the radical political aspects of the Nation of Islam's teachings.[9]

The hierarchical para-military organization of the Nation of Islam at DCC also posed a threat to prison security. As

**8.** Testimony of Sterling Hobbs.

> THE COURT: Well, you know, Mr. Hobbs, it is like this: Some of your views would be considered by people as being highly racist, just as if a member of the Ku–Klux–Klan got up and talked.
> THE WITNESS: I understand.
> THE COURT: They certainly could create havoc in a place like a prison by advocating views that may run contrary to security. So you can understand that?
> THE WITNESS: I do understand, your Honor.
> THE COURT: All right.
> THE WITNESS: ... I know the type of atmosphere that creates. I was hoping that we would have an opportunity to move people away from making a literal interpretation of what is actually a symbolic message.
> (D.I. 69 at A–43.)

**9.** Cross-examination of Warden Walter Redman.

> A: ... I don't care about your religion. You know, I have no desire to mess with that. I am concerned with the security of the institution. And that is why I still would feel secure now that we have this consultant, if there was an outside person, outside Imam, outside minister, then I would want this person our present consultant to kind of interview this person and let me know where he was coming from, and if my institution was secure with his teachings or preachings, or whatever you want to call it.
> (D.I. 69 at A–137.)

On direct examination, Treatment Superintendent Donald Davis explained that religious groups do not like bad publicity arising from their activities in prisons. If an outside minister is involved in a crisis at a prison, the religious organization will look worse than if an inmate minister instigates trouble. He therefore concluded: "And because of that, regardless of what that particular Imam might think, he has got to be a little more careful, a little more cautious." (D.I. 69 at B–10.)

On cross-examination, Treatment Superintendent Donald Davis further explained:

> A: ... [A]n outside Imam who comes here ... we choose that person.
> The inmate Imam is chosen by inmates. Generally speaking, I trust my ability to make a choice better than their ability to make a choice.
> (D.I. 69 at B–29.)

Treatment Superintendent, Donald Davis, explained:

> Primarily [such an organizational structure] provides or presents security problems because the strength of a security force in a prison, which is always under-manned, under-manned in comparison to the inmates, lies in the fact that it is organized, and an organized effort can always win out over a disorganized effort.
>
> If you have a group of [inmates] who are highly organized and disciplined in a military fashion, they represent a clear threat potentially to any prison system. . . .

(D.I. 69 at B–7.)

DCC Officials also noted that an inside Imam wields a great deal of power by virtue of his position at the top of an elaborate power structure. (D.I. 69 at A–139–40, B–7.) When an inmate is the Imam, there is great incentive to be radical in order to attract more members. (*Id.* at A–139–40.) This, in turn, increases the inmate Imam's power and the "homage" he will receive from other prisoners. (*Id.*) Use of an outside Imam can greatly defuse this potential threat to security. By using an outside Imam, the most powerful person in the Nation of Islam structure at DCC would be an outsider who has no reason to seek "homage," no interest in radicalizing the prisoners and is more likely to be responsible. As Superintendent Davis pointed out: "[An outside Imam] is not bound by any [inmate] code of honor. He is working for us." (*Id.* at B–5.)

With respect to the rehabilitation needs of the prisoners, again, the policy requiring an outside Imam was expected to further that goal. Prisoner rehabilitation is the primary responsibility of Treatment Superintendent Davis. (D.I. 69 at B–3.) His task is more manageable when he can freely discuss the rehabilitative needs of individual prisoners with visiting ministers. (*Id.* at B–5.) As Superintendent Davis himself stated:

> When we change something or when we feel there is a problem where there is an employee, we can discuss it with that employee with much more candor and in much greater detail than we could with an inmate because many times to discuss a problem with an inmate, you know, in a thorough kind of way you have to reveal security considerations that you just can't do with an inmate. So if you have an outside person you can communicate much more effectively, and he can with you.

(*Id.*) An outside Imam's greater awareness of changes in the outside world is also helpful in the rehabilitative process. (*Id.* at B–6.)

A further rehabilitation concern, with respect to the Nation of Islam, is that a para-military hierarchy de-emphasizes individual decision-making and personal responsibility. As Superintendent Davis noted: "[S]uch organizations de-emphasize the need to think to solve a problem. You solve a problem by acting, and solving problems by acting without thinking is what gets lots of men in prison to begin with." (*Id.* at B–8.) An outside Imam has less interest in maintaining the rigidity of a para-military hierarchy because, again, he is not dependent on "homage" from other prisoners. At the very least, an outside Imam is less able to maintain a rigid hierarchy because he is present in the prison for only a few hours each week.

The prison authorities at DCC have made several good-faith efforts to locate a qualified Nation of Islam Imam who could come to DCC to conduct services. (D.I. 69 at B–58–59.) Several Imams, who initially agreed to conduct services, never appeared.[10] Therefore, despite the efforts of

---

**10.** Direct Examination of Chaplain Pennell.

Q: Did you ever have occasion to contact Minister Farrakhan to get an IMAM to see to the total religious needs of the [inmate members of the Nation of Islam] in the Delaware Correctional Center?

A: Yes, sir. I tried desperately since 1985 to get somebody to come in.

Q: Did you ever have any success along that line?

A: No, sir.

DCC officials, no Nation of Islam services have been conducted since March 11, 1984. (*Id.* at A–126.)

It is admitted by the plaintiff that he is in regular contact with the Nation of Islam leadership in Chicago, including the organization's head, Minister Farrakhan. (D.I. 69 at A–20.) It is further admitted that the plaintiff could have an Imam sent to DCC to conduct Nation of Islam services, but that he will not do so because he believes that it is in the best interest of the inmates to have an inmate Imam. (*Id.* B–78–79.) The Court finds that an outside Imam, who is a member of the Nation of Islam, is available, or could easily be made available, to conduct Nation of Islam services at DCC, if Mr. Hobbs desired.

The record also reveals that the plaintiff, Mr. Hobbs, has had ample opportunity to practice most aspects of his religion. While the plaintiff's ability to engage in regular congregate activities in accordance with his religious beliefs has been somewhat restricted, he has chosen not to request an outside Imam and has been able to engage in individual prayer which is also recognized by the Nation of Islam. (D.I. 69 at A–47, A–132.) The plaintiff is also provided non-pork meals (*Id.* at A–7) and is allowed to participate in the observance of Moslem holidays and feasts, including the month-long Ramadan fasting. (*Id.* at A–7–8.) With respect to congregate services, the plaintiff admitted at trial that he has been able to attend services conducted by other Moslem groups in the prison and that he has actually been a guest speaker at some of these services. (*Id.* A–11–16, A–

48.) In fact, it is uncontested that Mr. Hobbs can presently attend any of the authorized Moslem services held at DCC. (*Id.* at A–11–16, A–28–29.) The Court finds that Mr. Hobbs was never prohibited from attending these other services and that Mr. Hobbs' perception to the contrary was based upon a misunderstanding in a correspondence between Chaplain Pennell and a third prisoner. (*Id.* at A–29, B–50–52; DX 1.)

While it is true that three other Moslem groups at DCC are permitted to conduct services with inmate Imams (D.I. 69 at A–35), it is also true that the same security and rehabilitation concerns do not apply to these groups. (*Id.* at A–140.) Further, the Nation of Islam was permitted to conduct services with an inmate Imam until the events of March 11, 1984 proved that such services were a serious threat to security. (*See supra* at 1042–1043.) Neither the Sunni Muslims nor the Moors Science Temple of America have similarly threatened the security of DCC. (D.I. 69 at 140.) With respect to the third Moslem group, the American Moslem Mission ("AMM"), Mr. Hobbs testified that the AMM caused dangerous disruptions in the prison in 1977. (*Id.* at 141–142.) But Mr. Hobbs added that after the 1977 disruptions, the AMM was, at first, prohibited from conducting services, and only later, permitted to resume services under the direction of an outside Imam. (*Id.*) This is exactly what the Nation of Islam has been required to do. It was only after a transition period, during which an outside Imam was present,

Q: Were you ever actually promised someone or given the name of someone who might be available to come visit?
A: Yes. Well, after Wilbert Fletcher did not show up in April and we had no further contact from him, he pulled out of the scene after that April memo that the warden put out, and then in July '85 we had another name, Vala Shabab (phonetic), was supposed to come and conduct services, and he never showed up either at that time.

Then in 1986 we met, the warden and I met with Mr. Akbar from the Nation of Islam, who wrote that memo in 1986, and he promised us that someone would come from Washington, D.C. to help us get services back. That gentleman never served either.

And throughout the years I have tried that, and most recently in '89 and '90 I have tried again to get a minister from the outside, and it wasn't until June of '90 that the Nation of Islam said they would send somebody, Mr. Muhammad, William Muhammad. And to this day he has not come to the institution, since June of '90, when we received that letter.
Q: Has he contacted you to your knowledge?
A: William Muhammad has not contacted us, but a Darrell Wilson has, and we met with him in September of '90.
(D.I. 69 at B–58–59.)

that the AMM inmates were once again permitted to conduct services. (*Id.*) Inmate led AMM services have been held since then without serious incident. (*Id.* at 140.) The Nation of Islam at DCC refuses to conduct services under an outside Imam and instead insists that it has a right to hold inmate led services without a transition period under an outside Imam. Mr. Hobbs' own testimony indicates that, under the circumstances, the Nation of Islam is not being treated differently from the other Moslem groups at DCC. The Court also notes that Protestant and Catholic services at DCC are not conducted by inmates. (*Id.* at A–16–17.)

A last point to be noted is that Mr. Hobbs announced at trial that he no longer seeks damages. (D.I. 69 at A–19–20.)

## CONCLUSIONS OF LAW

### I. PLAINTIFF'S CONSTITUTIONAL CLAIM ARISING FROM CHAPLAIN PENNELL'S ALLEGED REFUSAL TO ALLOW NATION OF ISLAM MEMBERS TO PARTICIPATE IN OTHER MOSLEM SERVICES

■ The Court will enter judgment in favor of the defendant with respect to the plaintiff's claim that Chaplain Pennell prevented Mr. Hobbs from attending other Moslem services at DCC. At trial, the plaintiff diverged from the factual allega-

tions he made in his complaint. At present, it is uncontested that Mr. Hobbs can attend any of the authorized Moslem services held at DCC, and that in the past, he has attended these other services. (D.I. 69 at A–11 *et seq.*) Mr. Hobbs' belief that he was not allowed to attend certain services was based upon a misunderstanding in a correspondence between Pennell and a third prisoner. Lastly, even if Hobbs was, in the past, prevented by Chaplain Pennell from attending other services, he has no remedy because he no longer seeks the only remedy available, money damages. Mr. Hobbs has provided no evidence that controverts these conclusions and, in fact, has presented no evidence on this issue at all.[11]

Therefore, pursuant to the Court's pretrial order, the only remaining issue is whether Pennell's enforcement of a policy requiring the presence of an outside Imam, before Nation of Islam services can be conducted, violates the plaintiff's Free Exercise rights.

### II. PLAINTIFF'S CONSTITUTIONAL CLAIM ARISING FROM THE ENFORCEMENT OF A DCC POLICY THAT REQUIRES OUTSIDE IMAMS TO LEAD NATION OF ISLAM SERVICES IN THE PRISON

■ The plaintiff has alleged that the enforcement of a DCC policy requiring out-

---

**11.** An involuntary dismissal of this claim under Fed.R.Civ.P. 41(b) would be equally appropriate because the plaintiff has failed to comply with an order of the Court. Often courts refer to a dismissal on this ground as a dismissal for failure to prosecute. 5 J. Moore, J. Lucas & J. Wicker, *Moore's Federal Practice* ¶ 41.12 at 41–152 (2d ed. 1990). In the Court's pretrial order of October 9, 1990, the parties were instructed to present evidence at trial on the issue of whether members of the Nation of Islam have been prevented from attending other Moslem services. (D.I. 67.) As noted above, Mr. Hobbs has failed to present any evidence on this issue. In fact, Mr. Hobbs has disavowed any interest in the issue. At trial he stated, with respect to the issue of whether he could attend other services: "that was Imam Idai's concern; that was not an issue that I was raising." (D.I. 69 at A–18.) Later the Court tried to ascertain exactly what Mr. Hobbs' "gripe" was and received the following answer:

> THE WITNESS: My gripe is, your Honor, that the Nation of Islam is not able to conduct

services and no other services would satisfy our need to worship.

> THE COURT: All right. That is exactly what I said a while ago. Your complaint, and the only complaint now, is that the Nation of Islam can't conduct religious services by its own Minister?
> THE WITNESS: Yes.
> THE COURT: Inside Minister?
> THE WITNESS: Yes.

(D.I. 69 at A–31.)

The Court has discretion to dismiss a claim with prejudice, *sua sponte*, under Rule 41(b), *Link v. Wabash R.R.*, 370 U.S. 626, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962), but should not do so if there is a less severe alternative. *Titus v. Mercedes Benz of North America*, 695 F.2d 746, 749 (3d Cir.1982). In the present case, because Mr. Hobbs has disavowed any interest in the claim, no less severe alternative is apparent. Nonetheless, because an adjudication on the merits is preferable, the Court will enter a final judgment on the claim rather than a dismissal. *Id.*

side Imams to lead Nation of Islam services violates his First Amendment Free Exercise rights as they are applied to the states by the Fourteenth Amendment. He seeks a remedy under 42 U.S.C. § 1983. A § 1983 claim can only be maintained if (a) the complained of conduct was committed under color of state law, and (b) a right accorded to the plaintiff by the Constitution or laws of the United States has been denied the plaintiff by the alleged conduct. The policy in issue here was instituted by Warden Redman and is enforced by the Chaplain Frank C. Pennell. Clearly, the enforcement of the complained of policy was carried out under color of state law; Redman and Pennell are both officials of the State of Delaware and DCC is a state correctional facility. The more difficult issue is whether the alleged conduct has deprived the plaintiff of his constitutional rights.

The conviction and confinement of a prisoner does not result in the prisoner's loss of all constitutional rights. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987). "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). On the other hand, prison walls are intended to separate convicted prisoners from the rest of society. This latter fact of life makes some limitation on a prisoner's exercise of his constitutional rights inevitable. As the Supreme Court has noted: "The limitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives." *O'Lone*, 482 U.S. at 348, 107 S.Ct. at 2404. Therefore, in order to determine whether the constitutional rights of a convicted prisoner have been violated, the Court must balance the competing interests of the prisoner and the state. Under *Turner*, this balancing of interests will be resolved in favor of the state whenever the state prison regulation or practice is "reasonable." *Id.* at 87, 107 S.Ct. at 2260. Ultimately, therefore, it is the Court's task to determine whether a particular regulation is "reasonable." *Id.*

at 84–85, 107 S.Ct. at 2259–60. In making this determination, the Court must give deference to the judgment of prison officials. *Id.*

## A. THE REASONABLENESS TEST

In *Turner* the Supreme Court set out four factors by which to test the "reasonableness" of prison regulations. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." 482 U.S. at 89, 107 S.Ct. at 2262 (citation omitted). Second, the Court should consider whether the inmate has alternative means by which to exercise the asserted right. *Id.* at 90, 107 S.Ct. at 2262. Third, the Court must address "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Fourth, if there are easy readily available alternatives to the regulation implemented, this is some evidence of "unreasonableness." *Id.* This last factor, though, is not a "least restrictive means" test. *Id.*

1. THE FIRST FACTOR: Whether the policy is rationally related to a valid penological interest.

In *O'Lone*, the Supreme Court noted three valid penological interests of the state—the deterrence of crime, the rehabilitation of prisoners, and institutional security. 482 U.S. at 348, 107 S.Ct. at 2404. The penological interests relied on in this case are institutional security and the rehabilitation of inmates. These are clearly valid penological interests. The only remaining issue is whether the challenged DCC policy is rationally related to the above stated penological interests.

In *O'Lone* the Supreme Court addressed the issue of whether two New Jersey regulations that made it impossible for inmates to attend weekly religious services, violated those inmates' First Amendment Free Exercise rights. The regulations in issue required inmates to work outside the prison and did not permit them to return during

the day. Dangerous overcrowding at the prison made the outside work details necessary. The prohibition against prisoners returning to the prison during the day, even for religious reasons, was justified on the grounds of institutional security and prisoner rehabilitation. The Court concluded that the prohibition on returns was rationally related to the above stated penological interests because (a) the process of returning prisoners forced guards to make additional decisions while outside the prison and caused congestion at the prison gate, both of which posed threats to security; and (b) by not permitting prisoners to return during the day, the work environment in the real world was better simulated, thus facilitating prisoner rehabilitation. *Id.* at 350–51, 107 S.Ct. at 2405–06.

In *Cooper v. Tard*, 855 F.2d 125 (3d Cir.1988), the Third Circuit applied the four-factored "reasonableness test" to inmates' claims that their Free Exercise rights had been violated by a prison regulation that prohibited daily meetings of the Nation of Islam in the prison yard. In *Cooper* the Third Circuit concluded that the prohibition on meetings was rationally related to institutional security because it prevented the formation of an affinity group and broke up an inmate "leadership structure." *Id.* at 129.

Given the facts of this case and the holdings in *O'Lone* and *Cooper*, the Court concludes that the DCC policy requiring outside Imams for Nation of Islam services is rationally related to institutional security and prisoner rehabilitation. The creation of a para-military organization that is comprised of prisoners and led by prisoners is a clear threat to prison security. This is particularly true where inmate leaders incite their followers to take over the prison, as occurred at DCC on March 11, 1984. Further, an organization that teaches individual irresponsibility and blind obedience clearly undermines the rehabilitative goals of the state. DCC officials have given several persuasive reasons why the introduction of an outside Imam would remedy the above threats to security and prisoner rehabilitation. (*See supra* at 1043–1044.)

The policy in issue here is a rational solution to these dangers.

■ The Supreme Court has also noted, with respect to this first factor, that "the governmental objective must be a legitimate and neutral one." *Turner*, 482 U.S. at 90, 107 S.Ct. at 2262. The objectives here are security and rehabilitation, both of which are "neutral" in character. Admittedly, these goals were threatened by the inmate led Nation of Islam services, in part, because of the content of the organization's teachings and its structure. The goals sought to be achieved by the DCC policy are nonetheless "neutral" in nature and that is what the Constitution requires. *Thornburgh v. Abbott*, 490 U.S. 401, 413, 109 S.Ct. 1874, 1881, 104 L.Ed.2d 459 (1989).

In *Thornburgh* the Supreme Court upheld a prison regulation that prevented certain publications from entering the prison, based on their content. Specifically, the Court held that the "reasonableness test" enunciated in *Turner* was applicable to content based prison regulations. The Supreme Court then noted, with respect to the "neutrality requirement" of *Turner*, that

> the Court's reference to "neutrality" in *Turner* was intended to go no further than its requirement in [*Procunier v.*] *Martinez* that "the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." 416 U.S. [396], at 413 [94 S.Ct. 1800, 1811, 40 L.Ed.2d 224 (1974)]. Where, as here, prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are "neutral" in the technical sense in which we meant and used that term in *Turner*.

*Thornburgh* at 415, 109 S.Ct. at 1882 (footnotes omitted).

Under *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 97 S.Ct. 2532, 53 L.Ed.2d 629 (1977), prison regulations that restrict an inmate's right to associate or join an organization, based

on the organization's stated purpose, will be upheld if the regulations are "rational." *Id.* at 134, 97 S.Ct. at 2542. The Supreme Court reached this conclusion because it reasoned that prisons are not public fora. *Id.* In *Jones*, the Supreme Court found a "rational basis" for the restrictions placed on the inmate union because the union was confrontational, and in the opinion of prison officials, a threat to institutional security. *Id.* at 135–36, 97 S.Ct. at 2543. Unless prison authorities are shown to have abused their discretion, "[t]here is nothing in the Constitution which requires prison officials to treat all inmate groups alike where differentiation is necessary to avoid an imminent threat of institutional disruption or violence." *Id.* at 136, 97 S.Ct. at 2543. Nor do prison officials have to wait until the eve of a riot to act. *Id.* at 132–33, 97 S.Ct. at 2541–42.

In the present case, DCC officials were concerned with the more radical views of the Nation of Islam. They in fact waited until the "eve of a riot" before restricting the organization's activities. Even after the near riot, DCC officials placed only minimal restrictions on the Nation of Islam. No aspect of the organization's teachings were prohibited. Instead, prison officials sought an outside Imam who, in their judgment, would satisfy the institution's security needs. The Court concludes that the DCC policy at issue is "neutral" under *Thornburgh* and *Jones.*

2. THE SECOND FACTOR: Whether the plaintiff inmate has alternative means by which to exercise the particular right.

The particular right in this case is Mr. Hobbs' First Amendment Free Exercise rights. The question, therefore, is whether Mr. Hobbs has sufficient alternative means by which to practice his religion, not whether there is an alternative to the particular activity prohibited by the regulation. In *O'Lone*, a prison regulation made it impossible for the inmates to attend weekly religious services. The Supreme Court held that the prisoners nonetheless had adequate alternative means by which to exercise their religion because they could still

congregate for discussion or prayer, there was a state-provided Imam, they received pork-free diets and were allowed to observe Ramadan. 482 U.S. at 352, 107 S.Ct. at 2406. Inmates had adequate "alternatives" even though it was impossible for them to attend the weekly Jumu'ah services required by the Koran. Similarly, in *Cooper*, the Third Circuit found that individual prayer, visits from an Imam, the opportunity to read religious materials, pork-free diets and observance of religious holidays constituted adequate alternative means by which inmates could practice their religion. No substitute opportunity for group prayer had to be provided. 855 F.2d at 129.

In the present case, the plaintiff, Mr. Hobbs, has several alternative means by which to exercise his First Amendment Free Exercise rights. The Nation of Islam recognizes individual prayer, which Mr. Hobbs is permitted to engage in. DCC policy permits Nation of Islam services, if they are conducted by an outside Imam. The Court has already found that it is within the plaintiff's power to have an outside Imam sent to the prison. Mr. Hobbs is permitted to join Sunni, American Moslem Mission and Moors Science Temple of America services and has in fact done so. Mr. Hobbs is permitted to observe the Ramadan fast, the Id feast and receives a pork-free diet. The only thing Mr. Hobbs has been denied is the right to have inmate led Nation of Islam services. Under *Turner* and *Cooper*, the Court concludes that Mr. Hobbs has had adequate alternative opportunities to enjoy his Free Exercise rights while incarcerated at DCC.

3. THE THIRD FACTOR: Whether accommodation of the right would have an adverse impact on other inmates, the guards or prison finances.

The impact of accommodating Mr. Hobbs' Free Exercise rights need not be great to be relevant. Even a slight adverse impact on the guards, prisoners or finances of the prison will add to the "reasonableness" of a regulation. In *O'Lone* the Supreme Court saw the extra cost of

**1050**

posting more guards, the development of affinity groups and the possibility of inter-group animosity due to perceived favorit-ism as unacceptable costs of accommoda-tion. 482 U.S. at 353, 107 S.Ct. at 2406. In *Cooper*, the Third Circuit found that in-mates would be adversely affected by the accommodation of the plaintiffs' rights be-cause the other inmates had, in the past, become inactive during Nation of Islam meetings in the prison yard. 855 F.2d at 130. With respect to adverse impacts on the prison, the Third Circuit noted that unsupervised activities such as the Nation of Islam meetings in question set a bad example for the other prisoners. *Id.*

In the present case, the Court concludes that a consideration of the adverse impact of accommodation also weighs in favor of the prison regulation. First, the Court notes that the members of the Nation of Islam intimidated both the guards and oth-er inmates at DCC. The resumption of inmate led services would most likely result in renewed intimidation. Second, the re-sumption of inmate led services would at the very least require additional guards, which would be a drain on prison re-sources. Accommodation of Mr. Hobbs' request that inmate led Nation of Islam services be resumed would adversely im-pact on the guards, the other inmates and the prison's finances. This factor also sug-gests that the DCC policy is "reasonable."

4. THE FOURTH FACTOR: Whether any easy and less restrictive alterna-tive to the prison policy exists.

The last factor the Court must consider is whether there are any easy, readily available alternatives to the regulation or policy implemented by the prison authori-ties. The burden of suggesting an easy alternative that "fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests," falls on the plaintiff inmate. *Turner*, 482 U.S. at 91, 107 S.Ct. at 2262. No such alternative has been suggested by the plaintiff. Instead, the plaintiff demands that inmate led ser-vices be resumed, the very type of service deemed to be harmful to the security and rehabilitative goals of DCC. The Court

finds that the responsible officials at DCC have instituted a benign policy that at-tempts to reach a compromise between the wishes of the plaintiff inmate and the valid penological interests of the state. Given the facts of this case, and the opinions of the Supreme Court in *O'Lone* and the Third Circuit in *Cooper*, the Court concludes that no other easy alternative policy is available to the officials at DCC.

The Court having found that plaintiff's constitutional rights have not been violat-ed, judgment will be entered forthwith in favor of the defendant and against the plaintiff.