Imam Abd'Allah Halim Abdul AKBAR, a/k/a Phillip M. Hudson, Plaintiff,

v.

Security Director BORGEN, Lynn Oestreich, Associate Warden of Security and Anna Secchi, Associate Warden of Treatment, Defendants.

No. 91–C–1165.

United States District Court, E.D. Wisconsin.

June 2, 1992.

**1182**

Imam Abd'Allah Halim Abdul Akbar, pro se.

James E. Doyle, Atty. Gen. by David E. Hoel, Asst. Atty. Gen., Madison, Wis., for defendants.

## DECISION and ORDER

MYRON L. GORDON, Senior District Judge.

On October 31, 1991, Imam Abd'Allah Halim Abdul Akbar, also known as Phillip M. Hudson, currently incarcerated at the Waupun Correctional Institution (Waupun), filed a petition to proceed in forma pauperis seeking redress under 42 U.S.C. § 1983. Specifically, Mr. Akbar demands redress from various prison officials at Waupun for alleged constitutional violations concerning the confiscation of his mail and files which were associated with the Muslim community at Waupun. In his complaint, Mr. Akbar seeks relief on his own behalf, and not on behalf of the Muslim community. On December 30, 1991, this court granted Mr. Akbar leave to proceed in forma pauperis to the extent that his petition stated an arguable claim that his first amendment rights were violated by the enforcement of prison regulations which permitted confiscation of his religious mail and files.

On January 21, 1992, Mr. Akbar filed a motion for a "Temporary Restraining Order and/or Preliminary Injunction." In his motion, Mr. Akbar requests (1) that the defendants be restrained from taking any further disciplinary or retaliatory action against him or other Muslim community members, pending the outcome of this action; (2) that the defendants return the Muslim community files and other doc-

uments that they have already confiscated; (3) that the defendants be required to notify him regarding any future confiscations of his mail or files and provide him with an opportunity to appeal and protest the confiscation; and (4) that the defendants be restrained from transferring him to another institution without his permission and from retaliating against him for filing this lawsuit.

On March 19, 1992, the defendants requested an extension of time in which to respond to Mr. Akbar's motion. By order of April 13, 1992, the motion was granted. On April 21, 1992, Mr. Akbar filed a "Notice and Motion in Response to Defendants [sic] Brief for Temporary Restraining Order and/or Preliminary Injunction" which requested that a "judgment ... be rendered, pursuant to Rule 60(b)," Federal Rules of Civil Procedure, against the defendants.

■ As a preliminary matter, Mr. Akbar's request for a judgment pursuant to Rule 60(b), Federal Rules of Civil Procedure, is perplexing insofar as that rule pertains to relief from a judgment or order that has already been entered; neither a judgment nor an order has been entered in this action to date. Moreover, Rule 60(b) does not purport to provide an independent basis upon which a court may render a judgment. Accordingly, in compliance with my obligation to construe the *pro se* plaintiff's pleadings liberally, see *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972); see also *Woods v. Thieret*, 903 F.2d 1080, 1082 (7th Cir. 1990), and because plaintiff's April 21, 1992, motion consists of responses to the assertions contained in the defendants' opposing brief, such "motion" will be treated as a reply to the defendants' opposing brief.

### I.

After a review of the submissions of the parties and supporting evidence (which was, for the most part, uncontested) and in accordance with Rule 52(a), Federal Rules of Civil Procedure, the court makes the following findings of fact:

Mr. Akbar, an inmate at Waupun, has undertaken to organize and maintain an inmate Muslim group called "Masjid Nabi Muhammad." It is undisputed that defendant Borgen was the security director at Waupun in 1988. Defendant Oestreich is presently the "associate warden—security" at Waupun, and defendant Secchi is presently the "associate warden—treatment" at Waupun. As a result of Mr. Akbar's attempts to organize and maintain the Muslim community at Waupun, various mailings, files, rules, and forms pertaining to the Muslim community have been designated as contraband and confiscated.

Among the items relating to the Muslim community which have been confiscated as contraband include the "Administrative Rules and Guidelines for an Institutional Setting" which purport to establish methods and procedures for maintaining order and discipline among the community members in the prison and to institute a system of delivering punishment for various identified offenses. (Secchi Aff. at ¶ 4, Request Ex. 1.) This document was "confiscated" when it was mailed by Mr. Akbar to the warden. (Secchi Aff. at ¶ 4, Request Ex. 1.) By memorandum of March 19, 1991, Mr. Akbar was notified by defendant Secchi of the basis for the confiscation and was warned that future activity in violation of the prison regulations would result in conduct reports. (Secchi Aff. Ex. X.)

The basis for the confiscation of this document, and all subsequently confiscated material relating to the Muslim community, was the prison regulations which prohibited "unsanctioned group" activity; these regulations include prohibitions against unsanctioned group business investment schemes and unsanctioned group banking operations. (Oestreich Aff. at ¶¶ 4, 15; Secchi Aff. at ¶ 5.) According to these prison regulations, inmates who wish to engage in group activities may do so only after the group applies for permission with the superintendent and has received his approval. *See* Wis.Admin.Code § DOC 309.365.

A group of inmates seeking approval to function as a sanctioned group must submit a written request to the superintendent

which contains the following information: (1) the name of the group; (2) the group's mailing address and telephone number, if it is that of another institution; (3) names of the group's officers; (4) the objectives and proposed activities of the group; (5) the number of members in the group; (6) the group's charter, constitution or bylaws, or all three documents; (7) the institutional services and resources needed; and (8) the anticipated length and frequency of group meetings. *See* Wis.Admin.Code § 309.-365(4). Neither the "Muslim Community" nor the "Masjid Nabi Muhammad" has been approved as an inmate group in accordance with the prison regulations. In fact, by memorandum of December 30, 1991, Mr. Akbar informed defendant Secchi that neither the "Muslim Community" nor the "Masjid Nabi Muhammad" wished to "function as a group" in accordance with the prison regulations; thus, it declined to obtain approval to act as a group within Waupun. (Secchi Aff. ¶ 18, Ex. Z.)

The prison regulations also provide that inmates who participate in an inmate group or inmate group activity that has not been sanctioned are guilty of an offense. *See* Wis.Admin.Code § DOC 303.20. Moreover, possession of items—including unsanctioned group literature—that is not permitted at the institution may result in both confiscation of the item and disciplinary proceedings against the inmate. *See* Wis.Admin.Code § DOC 309.35(5).

In December 1990, Mr. Akbar's mail, postmarked December 11, 1990, which contained materials relating to the Muslim community, was confiscated. Included in the confiscated mail were the following documents pertaining to the Muslim community: library rules, absentee ballot, "distribution form," a letter of notice regarding methods of discipline of the Muslim community members, donations form, "communications inventory form," request for "Zakat" (charitable giving), attendance form, minute sheet form, stamps inventory, "incident report" form, account information and purchase form, declaration of faith, "complaint" form, "judgment report" form, miscellaneous attachments to the administrative rules, a bank statement from the Co-

lumbia Savings and Loan in Milwaukee which indicated that $112.65 was maintained in an account under the name "Al-Ikhlas Books & Accessories," and disbursement requests payable to the Muslim community as Zakat. (Oestreich Aff. Ex. Request No. 5.) A notice of non-delivery of mail relating to these documents was issued on February 26, 1991, pursuant to Wis.Admin.Code § DOC 309.06(e). The record reveals that a conduct report was not issued to Mr. Akbar or to any Muslim community member as a result of this incident.

On May 24, 1991, and again on June 14, 1991, Mr. Akbar received a conduct report for possessing materials relating to the activities of the Muslim community. (Oestreich Aff. at ¶¶ 10–17; Secchi Aff. ¶¶ 13–15 and Exs. Y; Akbar Aff. ¶ 5.) The confiscated material was obtained during two separate searches of Mr. Akbar's cell. Included in the seized material was a booklet entitled "Notes, Minutes, Business," which contained three pages of "Issues" (Oestreich Aff. Ex. C), a letter from Mr. Akbar to Imam Jalal Ud–Din Muslim requesting the withdrawal of $50.00 (from an unidentified account) for the Muslim Student Association in Madison and of $50.00 for Imam Jalal Ud–Din Muslim's family, minute sheets from Muslim community meetings, and miscellaneous forms pertaining to the Muslim community. (Request Exs. 8A–L.) At the adjustment committee hearing held in connection with the May 1991, conduct report, Mr. Akbar was found guilty of "conspiring to cause a disturbance." (Oestreich Aff. ¶ 13, Ex. E.) At the adjustment committee hearing held in connection with plaintiff's June 1991 conduct report, Mr. Akbar was found guilty of disobeying orders and conspiring to operate an unauthorized group banking and business operation. (Oestreich Aff. at ¶ 15, Request Ex. 10, pp. 6, 7.)

On June 12, 1991, a conduct report was issued to Freddie Gee, another inmate and a purported member of the Muslim community. A search of his cell uncovered seventy pages of material relating to the Muslim community including a document entitled

"Muslim Community Investment Proposal"—a document identifying the bylaws and organizational structure of the Muslim community and referring to an investment scheme identified as "Halal–Rasool Meats, Inc." a form entitled "Contractual Agreement" which required a "contributor/investor" to invest $500.00 into an unidentified business and which imposed a $100.00 penalty for withdrawal of the investment; a form entitled "Investment Procedure" which notifies members that their investments—which "should never stop"—will remain in the Zakat account at the Columbia Savings and Loan Bank; and the Muslim community "Oath of Allegiance." (Secchi Aff. at ¶ 17; Request Ex. 7.)

Ms. Secchi issued the conduct report to Mr. Gee on the basis of her determination that these materials were evidence of unauthorized group activity by the Muslim community. (Secchi Aff. Ex. Y.) An adjustment committee hearing was held, and Mr. Gee was found guilty of "attempted enterprise" and "fraud," "conspiracy" (to operate an unsanctioned group) and "false names and titles." (Oestreich Aff. at ¶ 20 Ex. Y.)

Many policies have been implemented at Waupun to accommodate the beliefs and practices of the Muslim inmate population at Waupun. Muslims are permitted to engage in individual, daily prayer and are also allowed to engage in congregate worship in the chapel at Waupun every Friday and Sunday at 12:30 p.m. (Prendergast Aff. at ¶¶ 6, 10, Ex. 5.) During Ramadan, a Muslim holiday, additional arrangements are made to increase the hours available for congregate prayer and to accommodate the fast schedule and the Ramadan feast. (Prendergast Aff. at ¶¶ 11–14, Exs. 6–9.) Muslims who wish to abide by the dietary laws of their faith may consume pork-free food; weekly menus at the prison are marked so that inmates can avoid foods which contain pork. (Prendergast Aff. at ¶ 5.) Each Muslim inmate, upon request, may possess a personal copy of the Koran. (Prendergast Aff. at ¶ 9.) Further, Muslim inmates may utilize, at no charge, a variety of materials relating to the Muslim faith including audio tapes, periodicals, books and other publications, video tapes and prayer rugs. (Prendergast Aff. at ¶¶ 7, 8, Exs. 3, 4; Supplemental Aff. of Prendergast at ¶¶ 5, 6.)

## II.

### A.

■ In his motion, Mr. Akbar asks that a temporary restraining order or a preliminary injunction be issued against the defendants. However, because the defendants received notice of Mr. Akbar's request for equitable relief and have responded to Mr. Akbar's motion, I will treat Mr. Akbar's application as one for a preliminary injunction; thus, Mr. Akbar's motion for a temporary restraining order will be dismissed as moot. *See Levas and Levas v. Village of Antioch,* 684 F.2d 446, 448 (7th Cir.1982) (where the defendant had notice and contested the motion, the application was properly treated as one for a preliminary injunction and not as one for a temporary restraining order under Rule 65).

The court of appeals for the seventh circuit has ruled that a party seeking a preliminary injunction must make the following showing:

> (1) that it has no adequate remedy at law; (2) that it will suffer irreparable harm if the preliminary injunction is not issued; (3) that the irreparable harm it will suffer if the preliminary injunction is not granted outweighs the irreparable harm the defendant will suffer if the preliminary injunction is granted; (4) that it has a reasonable likelihood of success of prevailing on the merits; and (5) that the injunction will not harm the public interest.

*West Allis Memorial Hospital, Inc. v. Bowen,* 852 F.2d 251, 253 (7th Cir.1988); *Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 386–88 (7th Cir. 1984); *see also* Rule 65, Federal Rules of Civil Procedure. The movant is obligated to carry its burden of persuasion as to each element in order to be entitled to a preliminary injunction. *See Fox Valley Harvestore, Inc. v. A.O. Smith Harvestore Prod-*

*ucts, Inc.,* 545 F.2d 1096, 1097 (7th Cir. 1976).

### B.

█ Insofar as Mr. Akbar requests that the defendants be enjoined from transferring him to another institution without his permission and from retaliating against him for filing this lawsuit, he has not demonstrated that he will suffer irreparable harm if the preliminary injunction is not issued. That is, he has failed to establish that the likelihood of injury if the injunction does not issue is real and not speculative. *See Outboard Marine Corp. v. Liberty Mutual Insurance Co.,* 536 F.2d 730, 736–37 (7th Cir.1976); *Young v. Ballis,* 762 F.Supp. 823, 827 (S.D.Ind.1990).

Mr. Akbar has failed to proffer any evidence demonstrating (or even to assert) that he has suffered—or is likely to suffer—retaliation as a result of filing this lawsuit if the preliminary injunction does not issue. Similarly, he has failed to produce evidence demonstrating (or even to assert) that he is likely to be transferred to another institution in the event that the preliminary injunction is not issued. Accordingly, this portion of Mr. Akbar's request for equitable relief will be denied.

### C.

The remainder of Mr. Akbar's motion asks that the defendants be enjoined from disciplining members of the Muslim community for possessing materials relating to the Muslim community and that the defendants be ordered to return the material already confiscated and designated as contraband. As a basis for this request, Mr. Akbar argues that the prison regulations which require approval of inmate group activity unduly restrict his right freely to exercise his religion.

█ In order to meet the "threshold burden" of showing some likelihood of success on the merits, the movant need only establish that his chances are "better than negligible." *See Kellas v. Lane,* 923 F.2d 492, 494 (7th Cir.1990); *Somerset House, Inc. v. Turnock,* 900 F.2d 1012, 1015 (7th Cir.1990). Despite this low standard, I find

that Mr. Akbar has not demonstrated even a negligible likelihood of success on the merits of his claim that his first amendment rights were violated by the enforcement of the prison regulations.

█ Convicted prisoners do not forfeit all constitutional protections as a result of their conviction and confinement in prison, including those protections ensured by the first amendment's free exercise clause. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Woods v. O'Leary,* 890 F.2d 883, 884 (7th Cir.1989). However, lawful incarceration leads to a withdrawal or limitation of many privileges and rights which is warranted by valid penological considerations. *See O'Lone,* 482 U.S. at 348, 107 S.Ct. at 2404; *Woods,* 890 F.2d at 885. A prisoner's right to free exercise of his religion must give way to regulations that are "reasonably related to legitimate penological interests." *See O'Lone,* 482 U.S. at 349, 107 S.Ct. at 2404, (citing *Turner v. Safley,* 482 U.S. 78, 89, 107 S.Ct. 2254, 2261, 96 L.Ed.2d 64 (1987)); *Hunafa v. Murphy,* 907 F.2d 46, 47 (7th Cir.1990). Thus, in order for Mr. Akbar to succeed on his claim, he must demonstrate that the challenged prison regulations are not reasonably related to legitimate penological interests.

The court of appeals for this circuit has identified the following factors as relevant in determining the reasonableness of the regulation at issue:

(1) Is there a legitimate governmental interest underlying the prison regulation?

(2) Does the prisoner retain alternative ways of exercising the right in question?

(3) What impact would accommodation of the asserted constitutional right have on guards, other inmates, and on the allocation of prison resources?

*Richards v. White,* 957 F.2d 471, 474 (7th Cir.1992); *Al–Alamin v. Gramley,* 926 F.2d 680, 685 (7th Cir.1991); *Williams v. Lane,* 851 F.2d 867, 877 (7th Cir.1988), *cert. denied,* 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989).

**1.**

▮ The defendants contend that the regulations limiting unauthorized group activity are intended to prevent inmate groups from functioning as gangs, from engaging in organized disruptions or criminal activities within the prison, from engaging in organized violations of the prison rules and regulations and from challenging the authority of the prison and its officials. The legitimacy of the goal of eliminating prison gangs and maintaining order within the institution cannot seriously be debated. Organized gang activity is detrimental to the security, order and discipline that must be maintained within a correctional institution. *See Rios v. Lane*, 812 F.2d 1032, 1037 (7th Cir.), *cert. dismissed*, 483 U.S. 1001, 107 S.Ct. 3222, 97 L.Ed.2d 729 (1987). Thus, I find that the interest underlying the regulations at issue—preventing gang activity and maintaining order in the prison population—are legitimate penological objectives. Moreover, I am satisfied that there is a rational connection between the prison regulations requiring approval of inmate groups and inmate group activity and the governmental interests in containing gang activity and maintaining order within the prison.

In addition, it is apparent from the record that the regulations controlling group activity are facially neutral and are applied in a neutral fashion; the regulations are not applied to Mr. Akbar or to the Muslim community, in general, in a disparate fashion. *All* groups in Waupun, regardless of their religious affiliation, are required to seek approval prior to functioning as a group and are subject to further supervision and control by prison staff members. *See Woods*, 890 F.2d at 886 (whether regulations operate in a neutral fashion is relevant to a determination that the prison regulations are reasonable).

**2.**

▮ Mr. Akbar cannot and does not claim that the prison regulations that he challenges expressly prohibit the Muslim community from engaging in group activity or from exercising their religion. The regulations merely require that a group, as a prerequisite to functioning as such, must provide prison officials with information concerning various aspects of the group, so that the prison officials could ascertain the impact, if any, that the group would have on the prison. It was the decision of the Muslim community, as communicated by Mr. Akbar, that it would not attempt to gain approval as an inmate group under the regulations. *See Woods*, 890 F.2d at 886 (having failed to comply with the requirement that inmates file a proposal identifying the volume of mail anticipated prior to mailing correspondence relating to an inmate run business venture precluded the inmate from complaining that he was denied his ability to exercise his religious beliefs).

Although the regulations prohibit unsanctioned groups from dispersing or possessing *group* literature and from conducting unsanctioned group activity, including banking and investment activity, the record reveals that Muslim inmates are not deprived of all means of religious expression. Specifically, Muslim inmates are permitted to (1) engage in individual prayer, (2) congregate for prayer, (3) honor their dietary laws and religious holidays, and (4) possess a copy of the Koran. In addition, the prison provides inmates with access to prayer rugs and to a variety of religious literature and audio tapes relating to the Muslim faith.

Mr. Akbar does not identify any specific burdens on the *legitimate* religious function of the Muslim community at Waupun. Accordingly, I find that Muslim inmates at Waupun are provided with alternative means of practicing their religious beliefs. *See Al-Alamin*, 926 F.2d 680 (district court properly determined that Muslim inmates had reasonable opportunities to participate in their faith where basic religious services—ability to congregate for prayer, conduct private daily prayer and honor observance of Ramadan—and dietary needs were provided); *see also Woods*, 890 F.2d at 887 (where inmate was only restricted from utilizing the mails until he met the filing requirements but was still permitted to congregate for prayer and to practice his

**1188**

faith, he had alternative means of exercising his religious beliefs).

### 3.

The record reveals that the Muslim community wished to engage in unsupervised activity and was attempting to engage in investment and banking activity outside the prison and, through its rules and regulations, to establish its own hierarchy of authority and system of discipline and punishment. Such an alternative authority structure and potential for investment fraud poses a threat to other inmates and prison authority and impacts the allocation of prison resources. *See Cooper v. Tard*, 855 F.2d 125, 129 (3rd Cir.1988).

Moreover, if the prison officials allowed the Muslim community to engage in unsupervised group activity, including unsupervised investment and banking activity, the prison would have to extend this right to other groups within the prison. Because of the potential for a "ripple effect" of this sort, I am obligated to give deference to the discretion of the prison officials that was exercised when the prison regulations were established. *See Woods*, 890 F.2d at 887; *Hadi v. Horn*, 830 F.2d 779, 786 (7th Cir.1987).

I am also mindful of the fact that Mr. Akbar has failed to suggest how his legitimate concerns with the free practice of the Muslim community at Waupun might be accommodated by less restrictive alternatives to the challenged prison regulations. In the absence of any suggestions of this sort from Mr. Akbar, Waupun officials are not obligated to "set up and then shoot down every conceivable alternative method of accommodating [his] constitutional complaint." *Woods*, 890 F.2d at 887 (*citing Turner*, 482 U.S. at 90–91, 107 S.Ct. at 2262).

In light of the foregoing, I find, for the purposes of this motion, that Mr. Akbar has failed to establish that he has even a negligible likelihood of succeeding on the merits of his claim that the challenged regulations are not reasonably related to legitimate penological interests. Accordingly, it is the better exercise of discretion to deny Mr. Akbar's motion for a preliminary injunction.

### ORDER

Therefore, IT IS ORDERED that Mr. Akbar's motion for a temporary restraining order be and hereby is dismissed as moot.

IT IS ALSO ORDERED that Mr. Akbar's motion for a preliminary injunction be and hereby is denied.