**Imam Abd'Allah Halim Abdul AKBAR, a/k/a Phillip M. Hudson, Plaintiff,**

v.

**Security Director BORGEN, Lynn Oestreich, Associate Warden of Security and Anna Secchi, Associate Warden of Treatment, Defendants.**

No. 91–C–1165.

United States District Court,
E.D. Wisconsin.

Sept. 9, 1992.

---

Iman Abd'Allah Halim Abdul Akbar, pro se.

James E. Doyle, Atty. Gen., by David E. Hoel, Asst. Atty. Gen., Madison, Wis., for defendants.

## DECISION AND ORDER

MYRON L. GORDON, Senior District Judge.

On October 31, 1991, the plaintiff, Abdul Akbar, also known as Phillip Hudson, currently incarcerated at the Waupun Correctional Institution [Waupun], filed a petition to proceed in forma pauperis seeking redress under 42 U.S.C. § 1983. Mr. Akbar sought redress from various prison officials at Waupun for alleged constitutional violations concerning the confiscation of his mail and files which were associated with the Muslim Community at Waupun. In his complaint, Mr. Akbar seeks relief on his own behalf and not on behalf of the Muslim Community. On December 30, 1991, this court granted Mr. Akbar leave to proceed in forma pauperis to the extent that his petition stated a claim that his first amendment rights were violated by the enforcement of prison regulations which permitted confiscation of his religious mail and files.

Presently before the court is the defendants' motion for summary judgment along with their motion for leave to file a brief in excess of 30 pages pursuant to Local Rule 6, Section 6.01(c). Both of the defendants' motions will be granted.

## I. FACTS

On July 1, 1992, the defendants filed the instant motions along with supporting materials and the necessary information under Local Rule 6, Section 6.04 (where a party is appearing pro se in civil litigation, and the opposing party files a motion for summary judgment, counsel for the movant is required to include a "short and plain statement" regarding the consequences of not filing a response to the motion and a copy of Rules 56(e) and (f), Federal Rules of Civil Procedure). To date, the plaintiff has failed to respond to the defendants' motions, and the time for so doing has long expired. Local Rule 6, Sections 6.01(b) and 6.05(b) provide:

> Section 6.01(b). On all motions other than those for summary judgment, the opposing party shall serve an answering brief and, when necessary, affidavits ... within 21 days from the service of the motion.
>
> Section 6.05(b). [M]aterials in opposition to a motion [for summary judgment] must be filed within 30 days from service of the motion....

In the absence of a response from the plaintiff to the defendants' motion for summary judgment, the court is required to accept as true the factual assertions in the defendants' affidavits. *See* Local Rule 6, Section 6.04(1) and 6.05(d).

Consequently, the following factual assertions are accepted as true: Mr. Akbar, an inmate at Waupun, has endeavored to organize and maintain an inmate Muslim group called the "Masjid Nabi Muhammad." Defendant Thomas Borgen was the security director at Waupun in 1988. (Complaint ¶ III.c.) Defendant Lynn Oestreich is the "associate warden-security" at Waupun; his duties include administering and supervising the security program at Waupun and also implementing and monitoring the overall institution goals, policies and procedures. (Oestreich Aff. at ¶¶ 1 and 2.) Defendant Secchi is the "associate warden-treatment" at Waupun whose duties include overseeing all of the treatment and religious programs at Waupun. (Secchi Aff. at ¶¶ 1 and 2.)

As a result of attempts to organize and maintain the Muslim Community at Waupun, various mailings, files, rules, and forms pertaining to the Muslim Community have been designated as contraband and confiscated. Among the items relating to the Muslim Community which have been confiscated is a document entitled "Administrative Rules and Guidelines for an Institutional Setting." Such document purports to establish methods and procedures for maintaining order and discipline among the Muslim community members in the prison, and to institute a system of delivering punishment for various identified offenses. (Secchi Aff. at ¶ 4, Request Ex. 1.) This document was "confiscated" when it was mailed by Mr. Akbar to the warden of Waupun. (Secchi Aff. at ¶ 4, Request Ex. 1.) By memorandum of March 19, 1991, Ms. Secchi notified Mr. Akbar of the basis for the confiscation and warned him that future activity in violation of the prison regulations would result in the issuance of conduct reports against him. (Secchi Aff. Ex. X.)

The basis for the confiscation of this document, and all subsequently confiscated material relating to the Muslim Community, was the prison regulations which expressly prohibit all "unsanctioned group" activity; such regulations include prohibitions against unsanctioned group business investment schemes and unsanctioned group banking operations. (Oestreich Aff. at ¶¶ 4 and 15; Secchi Aff. at ¶ 5.) The relevant prison regulations specify that inmates who wish to engage in group activities may do so only after the group applies for permission to do so with the superintendent and has received approval from the superintendent. *See* Wis.Admin.Code § DOC 309.365.

In order to receive approval to function as a sanctioned group, a prospective group

of inmates must submit a written request to the superintendent and provide the following information: (1) the proposed name of the group; (2) the mailing address and telephone number of the group if it is that of another institution; (3) the names of the group's officers; (4) the objectives and proposed activities of the group; (5) the number of members in the group; (6) the group's charter, constitution or bylaws, or all three documents; (7) the institutional services and resources needed for the group to function; and (8) the anticipated length and frequency of group meetings. *See* Wis.Admin.Code § 309.365(4).

All sanctioned inmate groups in Waupun are subject to additional restrictions including: (1) a requirement that each group must have at least two Waupun employees as advisors who must attend all group meetings at which five or more members are present, and (2) a requirement that proposals must be submitted in order to receive permission to engage in group activities. (Knick Aff. at ¶ 3, Ex. 2.) The regulations were promulgated out of a concern that inmate groups, if not closely regulated, may function as gangs, engage in organized disruptions or criminal activities, engage in organized drug operations or establish group rules which interfere or clash with the institutions rules and guidelines. (Oestreich Aff. at ¶ 8.)

Neither the Muslim Community nor the Masjid Nabi Muhammad has ever been approved as an inmate group in accordance with the prison regulations, nor has either group ever applied for approval to function as a group within Waupun. Indeed, by memorandum of December 30, 1991, Mr. Akbar informed Ms. Secchi that neither the Muslim Community nor the Masjid Nabi Muhammad desired to obtain authorization to act as a group within Waupun. (Secchi Aff. ¶ 18, Ex. Z.)

The prison regulations provide that inmates who are members of an unsanctioned inmate group or who participate in unsanctioned inmate group activity are guilty of an offense. *See* Wis.Admin.Code § DOC 303.20. In addition, possession of items that are not permitted at the institution—such as unsanctioned group literature—may result in confiscation of the item

and disciplinary proceedings against the inmate. (*See* Wis.Admin.Code § DOC 309.-35(5); Knick. Aff. at ¶ 3, Ex. 1, p. 2.)

In December 1990, Mr. Akbar's mail, postmarked December 11, 1990, was confiscated because it contained materials relating to the Muslim Community—an unsanctioned group. (Oestreich Aff. at ¶ 3.) The confiscated mail was comprised of the following Muslim Community documents: (1) library rules; (2) absentee ballot; (3) forms distribution form; (4) a letter of notice regarding methods of discipline of Muslim community members; (5) donations form; (6) "communications inventory form"; (7) request for "Zakat" (charitable giving); (8) attendance form; (9) minute sheet form; (10) stamps inventory; (11) "incident report" form; (12) account information and purchase form; (13) declaration of faith; (14) "complaint" form; (15) "judgment report" form; (16) miscellaneous attachments to the administrative rules; (17) a bank statement from the Columbia Savings and Loan in Milwaukee which indicated that $112.65 was maintained in an account under the name "Al–Ikhlas Books & Accessories"; and (18) disbursement requests payable to the Muslim Community as Zakat. (Oestreich Aff. Ex. Request No. 5.)

On February 26, 1991, Mr. Oestreich issued a notice of non-delivery of mail to Mr. Akbar relating to these documents, pursuant to Wis.Admin.Code § DOC 309.06(e). (Oestreich Aff. at ¶ 5.) The record reveals that a conduct report was not issued to Mr. Akbar or to any Muslim Community member as a result of this incident.

On May 24, 1991, and again on or about June 12, 1991, Mr. Akbar received a conduct report for possessing materials relating to the activities of the Muslim Community. (Oestreich Aff. at ¶¶ 10–17; Secchi Aff. ¶¶ 13–15 and Ex. Y; Akbar Aff. ¶ 5 (Ms. Secchi states that she issued the conduct report on June 12, 1991, but Mr. Oestreich states that Ms. Secchi issued the conduct report on June 14, 1991).) The confiscated material was obtained during two separate searches of Mr. Akbar's cell. Included in the seized material was a booklet entitled "Notes, Minutes, Business," which contained three pages of "Issues"; (Oestreich Aff. Ex. C), a letter from Mr.

Akbar to Imam Jalal Ud–Din Muslim requesting the withdrawal of $50.00 (from an unidentified account) for the Muslim Student Association in Madison and of $50.00 for Imam Jalal Ud–Din Muslim's family; minute sheets from Muslim Community group meetings; miscellaneous forms pertaining to the Muslim Community, and a letter from Mr. Akbar to inmate Willie Kirkwood, also known as "Dirul." (Request Exs. 8A–L.) In the latter letter, Mr. Akbar discusses the formation of another unsanctioned group—"Mujahidin Al-Khalq"—for the purpose of establishing "an organized force of brothers who will give their Bayah [pledge of allegiance] to a trusted and worthy brother." (Oestreich Aff. at 14, Request Ex. 8D.)

At the adjustment committee hearing held in connection with the May 1991 conduct report, Mr. Akbar was found guilty of "conspiring to cause a disturbance." (Oestreich Aff. ¶ 13, Ex. E.) At the adjustment committee hearing held in connection with plaintiff's June 1991 conduct report Mr. Akbar was found guilty of disobeying orders and conspiring to operate an unauthorized group banking and business operation. (Oestreich Aff. at ¶ 15, Request Ex. 10, pp. 6, 7.)

Mr. Akbar was not the only inmate who received a conduct report as a result of unsanctioned Muslim Community activity. On June 12, 1991, a conduct report was issued to Freddie Gee, another inmate and purported member of the Muslim Community. A search of his cell uncovered 70 pages of material relating to the Muslim Community including a document entitled "Muslim Community Investment Proposal"—a document identifying the bylaws and organizational structure of the Muslim Community and referring to an investment scheme identified as "Halal–Rasool Meats, Inc."; a form entitled "Contractual Agreement" which required a "contributor/investor" to invest $500.00 into an unidentified business and which imposed a $100.00 penalty for withdrawal of the investment; a form entitled "Investment Procedure" which notifies members that their investments—which "should never stop"—will remain in the Zakat (charitable giving) account that is established in the Columbia

Savings and Loan Bank in Milwaukee; and the Muslim Community "Oath of Allegiance." (Secchi Aff. at ¶ 17; Request Ex. 7.)

Ms. Secchi issued the conduct report to Mr. Gee on the basis of her determination that these materials were evidence of unauthorized group activity by the Muslim Community. (Secchi Aff. Ex. Y.) An adjustment committee hearing was held, and Mr. Gee was found guilty of "attempted enterprise" and "fraud," "conspiracy" (to operate an unsanctioned group) and "false names and titles." (Oestreich Aff. at ¶ 20 Ex. Y.)

Many policies have been implemented at Waupun to accommodate the beliefs and practices of the Muslim inmate population at Waupun. Muslims are permitted to engage in individual, daily prayer and are also allowed to engage in congregate worship in the chapel at Waupun every Friday and Sunday at 12:30 p.m. (Prendergast Aff. at ¶¶ 6, 10, Ex. 5.) During Ramadan, a Muslim holiday, additional arrangements are made to increase the hours available for congregate prayer and to accommodate the fast schedule and the Ramadan feast. (Prendergast Aff. at ¶¶ 11–14, Exs. 6–9.) Muslims who wish to abide by the dietary laws of their faith may consume pork-free food; weekly menus at the prison are marked so that inmates can avoid foods which contain pork. (Prendergast Aff. at ¶ 5.) Each Muslim inmate, upon request, may possess a personal copy of the Koran. (Prendergast Aff. at ¶ 9.) Muslim inmates may utilize, at no charge, a variety of materials relating to the Muslim faith including audio tapes, periodicals, books and other publications, video tapes and prayer rugs. (Prendergast Aff. at ¶¶ 7, 8, Exs. 3, 4; Supplemental Aff. of Prendergast at ¶¶ 5, 6.)

## II. ANALYSIS

### A.

■ As a preliminary matter, the defendant has filed a motion for leave to file a brief in excess of 30 pages pursuant to Local Rule 6, Section 6.01(c). The defendants contend that the nature of the plaintiff's action requires analysis of "several

1484

hundred pages of documents." Thus, they argue that they were compelled to exceed the 30 page limit in order to summarize the documentary evidence for the court. A review of the voluminous record persuades the court that good cause exists to allow the defendants to file a brief in excess of 30 pages. Accordingly, the defendants' motion for leave to file a brief in excess of 30 pages will be granted.

### B.

█ A motion for summary judgment will be granted when there are no genuine issues as to material fact and the movant is entitled to judgment as a matter of law. Rule 56(c), Federal Rules of Civil Procedure. In order to succeed on a motion for summary judgment, the movant must demonstrate that (1) no genuine issue of material fact exists, and (2) it is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Further, under Rule 56(c), only "genuine" issues of "material" fact will defeat an otherwise proper motion for summary judgment. As defined by the United States Supreme Court, "material" facts are those facts which, under the governing substantive law, "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute over a material fact is "genuine" if "the evidence is such that a reasonable trier of fact could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

█ In the present action, the plaintiff has failed to respond to the defendants' motion or contest the factual assertions made by the defendants. Hence, for purposes of this motion, the defendant has successfully demonstrated the absence of a genuine issue of material fact. Nevertheless, in order for the present motion for summary judgment to be resolved in the defendants' favor, the defendants must also establish that the undisputed facts demonstrate that, as a matter of law, they are entitled to judgment.

This court previously tested the merits of the plaintiff's claim in response to the

plaintiff's motion for a preliminary injunction. By decision and order of June 2, 1992, I denied the plaintiff's motion based on my conclusion that the plaintiff had failed to demonstrate that he had even a negligible likelihood of succeeding on the merits. *Imam Abd'Allah Halim Abdul Akbar v. Borgen,* 796 F.Supp. 1181, 1186 (E.D.Wis.1992). With such conclusion in mind, I will now address the merits of the plaintiff's claim under the summary judgment standard.

### C.

The defendants' claim that they are entitled to summary judgment under the following four theories: (1) defendant Borgen did not have the requisite personal involvement in the incidents underlying the plaintiff's claim to subject him to liability under 42 U.S.C. § 1983; (2) the free exercise clause of the first amendment is not implicated in the enforcement of Waupun's restrictions on unsanctioned group activity; (3) the prison regulations on unsanctioned inmate group activity bear a reasonable relationship to legitimate penological objectives; and (4) qualified immunity.

### D.

Mr. Akbar claims that the prison regulations which require approval of inmate group activity unduly restrict his first amendment right to exercise his religion. The defendants contend that they are entitled to summary judgment because the prison regulations at issue do not implicate the free exercise clause of the first amendment. In the alternative, the defendants argue that even if the plaintiff's first amendment rights are implicated, they are entitled to summary judgment because the prison regulations bear a reasonable relationship to legitimate penological objectives.

█ In general, convicted prisoners do not forfeit all constitutional protections because of their conviction and confinement in prison. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987); *Woods v. O'Leary,* 890 F.2d 883, 884 (7th Cir.1989); *Borgen,* 796 F.Supp. at 1186. However, a withdrawal

or limitation of many privileges and rights which is warranted by valid penological objectives is a consequence of lawful incarceration. *See O'Lone*, 482 U.S. at 348, 107 S.Ct. at 2404; *Woods*, 890 F.2d at 885.

█ Assuming, for purposes of this motion, that the prison regulations at issue implicate the free exercise clause of the first amendment, Mr. Akbar's first amendment rights must give way to regulations that are "reasonably related to legitimate penological interests." Thus, in order for the defendants to be entitled to judgment as a matter of law, they must demonstrate that the challenged prison regulations are reasonably related to legitimate penological interests.

█ The following factors have been identified as relevant in determining the reasonableness of the regulation at issue:

(a) whether a valid, rational connection exists between the prison regulation and the legitimate governmental interest;

(b) whether the prisoner retains alternative ways of exercising the right in question;

(c) whether the accomodation of the asserted constitutional right has an impact on guards, other inmates, and on the allocation of prison resources;

(d) whether ready alternatives to the regulation. exist.

*Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 2661–62, 96 L.Ed.2d 64 (1987); *Richards v. White*, 957 F.2d 471, 474 (7th Cir. 1992); *Al-alamin v. Gramley*, 926 F.2d 680, 685 (7th Cir.1991); *Williams v. Lane*, 851 F.2d 867, 877 (7th Cir.1988), *cert. denied*, 488 U.S. 1047, 109 S.Ct. 879, 102 L.Ed.2d 1001 (1989).

(1).

█ It is undisputed that the governmental interest underlying the challenged prison regulations is a concern that such groups may in reality function as gangs, may become involved in organized disruptions or criminal activities, may engage in organized drug operations, may engage in organized intimidation of non-group inmates, may engage in fraudulent activity at the expense of nongroup inmates and may establish rules which clash or interfere with the institution's rules or operation. "The legitimacy of the goal of eliminating prison gangs and maintaining order within the institution cannot seriously be debated." *Borgen*, 796 F.Supp. at 1187.

Accordingly, I find that the interest underlying the regulations at issue—preventing gang activity and maintaining order in the prison population—is a legitimate penological objective. *See Borgen*, 796 F.Supp. at 1187. The reasonableness of the challenged regulations is further demonstrated by the fact that such regulations are facially neutral and operate in a neutral fashion. *See Woods*, 890 F.2d at 886 (whether regulations operate in a neutral fashion is relevant to a determination that the prison regulations are reasonable). It is undisputed that *all* groups in Waupun—secular and nonsecular—are required to obtain approval before functioning as a group and are subject to supervision by prison staff members subsequent to obtaining approval.

(2).

Even assuming that the challenged regulations interfere with Mr. Akbar's ability to exercise his religious beliefs, it is apparent from the record that Mr. Akbar—and the Muslim Community in general—are not deprived of all means of religious expression. Hence, although the undisputed facts establish that the regulations, as enforced, prohibit the Muslim Community, as an unsanctioned group, from engaging in activity such as banking and investment ventures, the legitimate religious functions of the Muslim Community are unburdened. Accordingly, I find that Mr. Akbar is not deprived of all means of religious expression. *See Al–Alamin*, 926 F.2d 680 (7th Cir.1991) (district court correctly determined that Muslim inmates were provided with reasonable opportunities to participate in their faith); *see also Woods*, 890 F.2d at 887 (where *sole* limitation on inmate's activities was condition that he meet filing requirement before utilizing the mails for religious mailing, inmate had reasonable alternative means of exercising his religious beliefs).

(3).

█ It is undisputed that Mr. Akbar through the Muslim Community wished to

**1486**

participate in unsupervised conduct and was attempting to engage in investment and banking ventures outside the prison. Also, he wished to create a hierarchy of authority and system of discipline and punishment distinct from that of the prison. Such unsupervised activity and alternative authority structure, if accommodated, could create the potential for investment fraud and organized disruptions and, in turn, pose a threat to other inmates and the prison authorities and impact the allocation of prison resources. *See Cooper v. Tard,* 855 F.2d 125, 129–30 (3rd Cir.1988). In addition, if Mr. Akbar's asserted constitutional right—engaging in unsanctioned Muslim Community activity—were accommodated, a parallel right would have to be extended to other groups within the prison. The likelihood of a "ripple effect" of this type requires that I give deference to the discretion of the prison officials who established the prison regulations. *See Woods,* 890 F.2d at 887; *Borgen,* 796 F.Supp. at 1188.

**(4).**

"[T]he absence of ready alternatives to accommodate inmate's rights is evidence of the reasonableness of a prison regulation." *Cooper,* 855 F.2d at 130. Insofar as the right claimed by Mr. Akbar was to operate the Muslim Community as an unsanctioned group and engage in unsupervised activity through the Muslim Community, there are no alternatives consistent with the concept and policies of Waupun to accommodate his asserted right. Further, Mr. Akbar has failed to suggest any such alternatives. In the absence of any suggestions of this sort from Mr. Akbar, Waupun officials are not obligated to "set up and then shoot down every conceivable alternative method of accommodating [his] constitutional complaint." *Woods,* 890 F.2d at 887 (citing *Turner,* 482 U.S. at 90–91, 107 S.Ct. at 2662–63); *Borgen,* 796 F.Supp. at 1188.

## III. CONCLUSION

In view of the above, I find that the undisputed facts demonstrate that the chal-

lenged prison regulations bear a reasonable relationship to legitimate penological objectives such that the defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment will be granted.

Having reached this conclusion, it is not necessary for me to address the defendants' remaining three theories of relief— (1) lack of personal involvement on behalf of Mr. Borgen; (2) that the free exercise clause of the first amendment is not implicated in the enforcement of Waupun's restrictions on unsanctioned group activity; and (3) qualified immunity. This decision and order does not purport to rule on the merits of those theories.

## ORDER

Therefore, IT IS ORDERED that the defendants' motion for summary judgment be and hereby is granted.

IT IS ALSO ORDERED that the plaintiff's action be and hereby is dismissed, with prejudice.